DAWKINS, J.
This is an action sounding in damages for the death of plaintiff’s husband, Albert Llewelln Lackaye. She alleges *311 that her said husband was killed through the fault and negligence of defendant, by an automobile belonging to the latter, driven upon the streets of the City of New Orleans by his chauffeur.
Defendant excepted on the ground that the petition disclosed no cause or right of action, and was too vague and indefinite to permit him to plead thereto.
The exception of no cause and no right of action does not appear to have been passed upon, but the plea of vagueness was sustained to the extent of ordering plaintiff to amend her petition “by stating if there are any minors or not.” In obedience to said order, plaintiff answered that there was no issue born df her marriage with deceased, and that he left no minor children.
For answer, defendant admitted that Lack-aye was killed by his automobile, driven by his chauffeur, but denied any negligence on his part or that of said driver, and averred that the accident was due to the contributory negligence of deceased in stepping in front, of said machine at a time when it was impossible to stop and avoid collision.
The case was tried before the court without a jury, who gave judgment in plaintiff’s favor for the sum of $10,000. Defendant appealed, and plaintiff has answered, praying that the amount allowed be increased to the sum of $28,500.
The Facts.
On the day of the accident Efrian M. de la Ossa, the chauffeur of defendant, drove the automobile, with defendant and his son, Wm. J. L’Engle, Jr., as passengers, from their residence to the Whitney Central Bank building on the corner of St. Charles and Gravier streets, in the city of New Orleans, where defendant was discharged, and the car then proceeded, with L’Engle, Jr., and the chauffeur both on the front seat, out Gravier street, to Camp street, then down the latter to its intersection with Canal 'street, the city’s main thoroughfare, where the car stopped, being signaled so to do by the traffic officer, and becatise, as L’Engle, Jr., says, the semaphore on the crossing indicated that they should. They (L’Engle, Jr., and the chauffeur) as witnesses, further state that it was their desire to proceed down Canal street, toward the Mississippi river, and, after signaling this wish to the officer, he directed them to proceed. The automobile, instead of making a close turn to the right around the uptown river corner of Canfp and Canal streets, as the traffic regulations require, made a wide swing into Canal street, the driveway of which at this point is 37 feet 4 inches wide, so that the left side of the front of the car struck, knocked down, and the'two left wheels passed over the body of the plaintiff’s husband, inflicting injuries from which he died within approximately a week. The collision occurred within 3 or 4 feet of -the neutral ground of Canal street, and after passing over the body of deceased, the car ran upon the neutral ground and stopped on the street car track in front of a street car approaching from the automobile’s rear and moving towards the river. Both L’Engle and the chauffeur say that the wide turn just described was made necessary by the position of the traffic officer, who was some 4 or 5 feet in the street from the corner of the sidewalk, and owing to the acuteness of the angle made by the intersection of the river side of Camp with the uptown side of Canal street. Other witnesses describe the movements of the automobile as indicating that the driver had first intended to ■ cross Canal street, but for some reason, after reaching a point beyond the center of the uptown driveway, to have changed his course and turned out Canal toward the river. D’Engle does not" remember what their destination was, but de la Ossa, the chauffeur, says they were going to the Maison *313 Blanche building, which was on the downtown side of Canal street, some three blocks .to their left and further away from the river. The crossing at Canal and Camp street was one, to the knowledge of both occupants of the automobile, over which traffic, including automobiles, was permitted to pass to the lower or downtown driveway of Canal, and up which it moved in the direction of the Maison Blanche building, and the only reason given for going down Canal and away from their destination was that suggested by de la Ossa, to wit, that L’Engle, Jr., liked- to look al^the river. L’Engle, although stating that their intention was to go towards the river, did not give any particular reason therefor.
[1] The question as to which way the deceased was going, whether downtown and away from Camp street, or uptown and toward the sidewalk on the river side of that street, has an' important bearing upon the case. It is the contention of plaintiff’s counsel that Lackaye was crossing the driveway to the neutral ground, and had reached a point within a few feet thereof when struck, while defendant claims he was going in the opposite direction; that is, from the neutral ground to the sidewalk along Camp, or uptown. Plaintiff’s contention is supported by the testimony both of the traffic officer at the corner, the officer who was operating the semaphore, a chauffeur on a truck who was on the downtown side of the neutral ground waiting for the signal to cross up and over Canal street,- and the motorman on the street car which came near running into the automobile after it ran upon the track, all of whom say that deceased was crossing from the direction of uptown. Defendant points to the testimony of the witness Souer, who swore that he was on the downtown side of the driveway, within 2 or 3 feet of the neutral ground, and going in the direction of Camp street, and that deceased “stood alongside of me, almost touching elbows,” and in response to the question as to how it happened that he escaped and Lackaye was struck, said, “I stepped to the right, and he stepped to the left.” Souer does not say that deceased was traveling uptown, or that he was facing in that direction, but the inference probably would be drawn from his statements, in the absence of countervailing proof that he was facing in the same direction as the witness.
Without wishing to impute an improper motive to any witness, we seriously doubt, in the light of everyday experience, if any of them had noticed Lackaye until about the instant when the collision became imminent. With great numbers of people crossing the two streets at four places in twice as many directions, there would be no good reason why any one should be able, after an accident happened, to say that he had noticed any one else at any appreciable time beforehand, unless something unusual, had attracted his attention. Eor this reason Souer’s testimony goes about as far as it was possible for it to have gone when he says that deceased was on his left, and that was most likely the relative position which he did occupy when the oncoming of the machine compelled Souer to move in order to avoid being struck. So that, in circumstances like these, we think the most dependable evidence is the proven physical facts and circumstances. There seems to be' no dispute, but that Lack-aye was struck by the machine on the left side, and if he had been traveling uptown, it would have been necessary, in stepping to the left, as Souer says he did, to have turned about with his face in the other direction, thus turning his back to the driveway and the approaching car; otherwise his turn would have been to the right and in the same direction as Souer. If he was coming from Gamp street his back and left side were already turned toward the automobile, and as it circled around and approached him from *315 the left, it would most likely not be seen by him until it was very close, and. his natural impulse would have been to move to his right and away from it, and which was the same direction as Souer says he did move. In these circumstances the car would have struck him just as it did.
[2] Our conclusion, therefore, is that deceased was crossing from the sidewalk to the neutral ground; that he was not aware of the presence of the automobile until it was practically upon him, too late to escape and avoid b&ing struck, and that but for the wide turn which the driver made, in violation of the traffic regulations, would have been in no danger. We are not convinced, from all of the evidence, that the traffic officer was in such a position, or that any other circumstance justified the unusual course which the automobile took, and which in our opinion was an act of negligence contributing proximately to the injury. The evidence also indicated that the chauffeur’s experience at driving automobiles was rather limited, and we are very much impressed that he either became excited and put his foot on the accelerator, or otherwise lost control of his car, else it would not have proceeded as far as it did upon the neutral ground and car track. Going at four miles per hour, as he claims to have been, an experienced driver should have been able to stop almost instantly. Traveling at the point which deceased had reached when struck, under ordinary circumstances, he needed only to look out for vehicles coming down Canal street, and there was no occasion for him to expect one to come practically from behind, as the one in this instance did. If it had observed the traffic regulations, as he had a right to assume would be done, the accident would not have happened.
[3] Considering the age, 67, earning capacity, $30 per week, life expectancy, and intense suffering which deceased endured for almost a week, with little or no hope of recovery, we think the amount allowed by the lower court was fair and reasonable.
For the reasons assigned, the judgment appealed from is affirmed, at the cost of appellant.