(91 South. 527)

No. 24648.

## GRAY et al. v. FOUNDATION CO.

(March 20, 1922.    Rehearing Denied May 1, 1922.)

*(Syllabus by Editorial Staff.)*

**1. Negligence ☞105—Passholder's agreement to assume risk without consideration.**

Where a shipbuilding company, issuing passes to the public to witness ship launchings, made no charge for admission to any one, a provision in a pass that the holder assumed any risk of injury was without any valuable consideration, and not binding on him and his heirs.

**2. Negligence ☞32(2)—Guest at ship launching held invitee, not licensee.**

Where an oil salesman, who was also an expert on the application of lubricants, had supervised the application of grease to the way's at previous ship launchings, and at the time of another launching was called to the shipbuilding plant and invited by the chief marine architect to make an inspection, and, though seen by the manager of the works, was given no intimation that he was exceeding his lawful rights as a guest, he was entitled to the rights of an invitee, and not merely those of a licensee, even though the employee telephoning him to come to the plant was without authority to extend such invitation.

**3. Negligence ☞32(2) — Holder of pass to ship launching held invitee.**

A shipbuilding company's exemption from liability under a pass admitting one to a ship launching was waived if it ever existed, though the holder's status was thereby fixed at the time of its issuance as that of a mere licensee, where he was invited by the chief marine architect to go under the ship for the purpose of giving his aid and advice as a lubricating expert for the company's benefit.

**4. Negligence ☞32(1)—Reasonable care as to invitee required.**

A shipbuilding company owed to an invitee, present at a ship launching, the duty of exercising reasonable care not to injure him through any act of negligence on its part.

**5. Negligence ☞44 — Shipbuilder held negligent as to invitee.**

The failure of a shipbuilding company to use a trigger to control the time of the launching of a ship *held* negligence where the bolts used to connect the sliding ways with the permanent ways were not sufficiently large, permitting the ship to break loose while an invitee was under it for the purpose of giving his advice as an expert on the lubrication of the ways.

**6. Negligence ☞66(1)—Invitee at ship launching held not negligent.**

One present at a ship launching who was invited to go under the ship to give his advice as an expert on the lubrication of the ways had a right to rely on the designated signals being given, and, where the ship broke loose before they were given, was not negligent in being under the ship or in relying on the greater knowledge of his companions, who were experts in shipbuilding.

**7. Death ☞98—$15,000 held not inadequate.**

A judgment for $15,000 for the death of a man leaving a wife and four minor children, two of whom were 19 and 15 years old, was not inadequate where he left no property, was in debt to the amount of $600, had life insurance amounting to $1,800, and the widow had an earning capacity.

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Action by Mrs. Edward S. Gray, tutrix, and others, against the Foundation Company. From a judgment for plaintiffs for $15,000, defendant appeals. Affirmed.

P. M. Milner and Spencer, Fenner, Gidiere & Phelps, all of New Orleans, for appellant.

Henry W. Robinson, of New Orleans, for appellees.

By Division B, composed of Justices O'NIELL, LAND, and BAKER.

LAND, J. Plaintiff has instituted this suit in her own behalf and as natural tutrix of her four minor children to recover damages against defendant company for the death of her husband, Edward S. Gray, on October 19, 1919, alleged to have been caused by the negligent launching of the steamship Laplace at the shipyard of the Foundation Company, which was engaged at the time in constructing merchant vessels for the government of France at its plant locat-

ed on the Industrial Canal in the parish of Orleans.

Plaintiff alleges that, while her husband, Edward S. Gray, and his companion, Dr. Gustave Prochaska, chief marine architect of said company, were beneath the vessel examining the lubrication of the ways, the vessel tore itself loose from its fastenings, 12 minutes before the time fixed for the launching, and that the vessel slid down the ways, pulling two cables running from bow to stern, to which were attached the blocks on which the vessel had rested, killing both petitioner's husband and Dr. Prochaska by mangling them with the cabled blocks until they were torn almost beyond recognition.

Petitioner charges that her said husband was on the premises of the defendant company as an invitee, and that the killing of her husband was due to the gross carelessness and negligence of said company, its officers and employees, in these particulars:

"(a) That the vessel was permitted to be launched 12 minutes before the time scheduled, and that no warning of this change was given to the men who were killed.

"(b) That the top slideways on which the said steamship Laplace was launched pulled out from the ends, because they were too weak and bolted with too few bolts; that these slideways were 12x12 timbers overlapping the 12x12 timbers of the ends of the ways, and that they were secured to each other by two iron plates, one on the right side and one on the left, which plates were only 4 feet long and which contained only two three-quarter inch bolts at each end, and these bolts, instead of being staggered, were in a straight line, with the result that, when the blocks were removed and the ship settled down upon the launching ways, the entire weight came upon the two sets of iron bolts three-quarters of an inch in diameter and 24 inches in length, which were far too feeble to hold back the immense weight and strain, and, instead of holding the vessel secure until the ends of the slide could be sawn through, as was projected, two of the bolts pulled through the wood, and the bolts on the other side sheared off the heads, so that the vessel literally tore itself loose from the ways and slid into the water, having gone beyond the control of those in charge.

"(c) In launching a vessel lengthwise, the only reasonably safe way of holding the launching ways to the balance of the ways is to use a trigger consisting of a steel bar which can be pulled out at precisely the moment desired and which will hold a ship in readiness for launching until the trigger is removed.

"(d) To facilitate picking up the blocks on which the vessel rested after her launching, the designer of the Laplace had devised a scheme of tying together all of these blocks, several hundred in number, by having a hole through each of the blocks and running a cable from the bow to the stern of the vessel, passing through the upper of the two blocks on the port side and returning from aft to the bow through the lower block. A similar cable was woven through the blocks on the starboard side. That this resulted in the launched vessel dragging along the ways two long lines of cables containing hundreds of blocks, which bore the two men down the ways into the water and horribly mangled them.

"Had it not been for this device, it would have been possible for Dr. Prochaska and Mr. Gray to have remained in safety under the vessel while it was being launched, and that instantly severing the cable which tied the blocks, as soon as it was discovered that the ship was prematurely going down, would have likewise prevented the disaster."

Defendant denies that the killing of said Gray was due to its negligence and carelessness or to the negligence and carelessness of its officers and employees. Defendant denies that said vessel was permitted to be launched 12 minutes before the time scheduled, and avers that the said Gray was warned to get out from under the ship.

Defendant admits that the top slides or timbers forming the sliding ways pulled out at the upper end because the iron straps parted, when the vessel began to move or creep, and avers that the form of construction used in building the sliding was a customary and usual form, and that the use of the said form of construction by respondent was not negligent or careless.

Defendant denies that the only safe way of holding the sliding ways is to use a trigger, and avers that its failure to use a trigger in launching the Laplace was not negli-

gent or careless. Respondent admits that the blocks upon the top of the slidings upon which the vessels rested after the removal of the keel and side blocks were fastened together with cables, and avers that this is a proper and customary method devised to save labor in picking up the blocks in the water after the launching, and that the adoption of such method was not negligent or careless; that the death of said Gray was due to his gross carelessness in going under and remaining under the ship while it was in the process of being launched.

It is admitted in the answer of respondent that the deceased, Edward S. Gray, at the time of his death, was employed by the Texas Oil Company to secure orders for the sale of lubricants. Respondent admits that up to the time of the launching of the Laplace it had purchased some grease from the Texas Oil Company; that Edward S. Gray as salesman of the Texas Oil Company, was constantly and repeatedly soliciting respondent to purchase launching grease from him. Respondent admits that Edward S. Gray, in his constant efforts to sell launching grease to respondent, constantly came to respondent's office at its shipyard and solicited and obtained passes or permits to the launching of vessels, and was present at such launchings.

Respondent avers that said Gray without invitation from respondent came to respondent's shipyard some time during the day of November. 19, 1919, and requested and obtained a pass authorizing his admittance to the launching, and that all of the passes issued by it, including the pass issued to the said Gray, contained a stipulation and conditions reading as follows:

"This pass is given at my request, and I hereby assume every risk of injury to my person or property which may occur."

Respondent admits that, after receiving this pass, the said Gray entered respondent's yard, and proceeded to where the vessel Laplace was on the ways, and went under the vessel; but respondent avers that the said Gray, after reaching the ways upon which the vessel Laplace was resting preparatory to launching, was not only not required to go under said vessel, but that the inspection of the grease on the said ways was no part of the business of said Gray, who was a mere visitor there on his own pleasure and personal business; that said Gray was not in respondent's employ, but was a salesman of the Texas Oil Company, and was not required or asked to examine the launching grease which had been placed upon the said ways: that, as a matter of fact, practically all the launching grease used in launching the vessel Laplace had not been purchased from the Texas Oil Company; and that only a very small quantity of Texas Oil Company grease was used on the ways in the launching of the Laplace.

Respondent also avers that the said Gray, while at its shipyard on November 19, 1919, spoke to Mr. Bacon, who was at the time and still is respondent's works manager, and who is the person in authority, having charge of the launching of all vessels, and that said Gray went under the vessel without the knowledge or consent of Mr. Bacon

Respondent denies that Dr. Gustave Prochaska was in charge of the application of the grease to the ways at the launching of the vessel Laplace, and avers that Dr. Prochaska was the chief draftsman and designer of respondent, and that he was not employed to apply or superintend the application of grease to the launching ways, and that the duties of his employment did not extend to the launching of ships.

Respondent avers that the said Gray, in going under said vessel, went at his own peril and for his own purposes, and not in the interest or at the invitation of respondent.

[1] Defendant company claims exemption

from liability in this case because of the stipulations and conditions contained in the pass issued to Mr. Gray and signed by him, and which he used to gain admission to the shipyard of defendant company on the date of the accident.

This pass reads as follows:

"Do not talk to employees except in department stated. No cameras allowed in works. This pass is given at my request, and I hereby assume every risk of injury to my person or property which may occur."

This is the form of pass which defendant company usually issued to a certain number of the public to witness the launching of its large seagoing vessels.

It is not pretended that any charge for admissions was made on any of these occasions. The pass held by Mr. Gray was not, therefore, a gratuity, in the sense that it was a free pass, while others were required to pay for the privilege of witnessing the launchings.

The assumption "of every risk of injury to the person" by Mr. Gray was without any valuable consideration whatever, and therefore is not binding upon him and his heirs.

The case at bar differs materially from those cases in which a passenger is transported without hire, and the pass upon which he travels exempts the common carrier from liability for acts of negligence, as a consideration for the gratuity which he has received.

As was said by the Supreme Court of the United States, in the case of Northern Pacific v. Adams, 192 U. S. 453, 24 Sup. Ct. 411, 48 L. Ed. 518:

"The railway company was not, as to Adams, a carrier for hire. It waived its right as a common carrier to exact compensation. It offered him the privilege of riding in its coaches without charge if he would assume the risks of negligence. He was not in the power of the company and obliged to accept its terms. They stood on an equal footing. If he had desired to hold it to its common-law obligations to him as a passenger, he could have paid his fare and compelled the company to receive and carry him. He freely and voluntarily chose to accept the privilege offered, and, having accepted that privilege, cannot repudiate the conditions. It was not a benevolent association, but doing a railroad business for profit; and free passengers are not so many as to induce negligence on its part. So far as the element of contract controls, it was a contract which neither party was bound to enter into, and yet one which each party was at liberty to make, and no public policy was violated thereby."

The shipyard of defendant company was not open to the public to be visited at will. No member of the public could compel defendant company to grant admission, upon the payment of a price. No one was permitted to enter the plant of defendant company, except with its consent, granted upon such conditions as it might dictate. No one was at liberty, upon the payment of an admission fee, to modify these conditions and enter upon its premises, free from stipulation against its acts of negligence. There was no liberty upon the part of the deceased, or, upon the part of any member of the public to make any contract, except upon the conditions prescribed by defendant company, to enter upon its premises. The case at bar, therefore, is radically different from the case of a passenger voluntarily riding on a free pass, and unnecessarily waiving acts of negligence, for a valuable consideration, for in the present case there was neither consideration for the waiver, nor liberty of contract against it, and it is therefore nudum pactum and void, as far as assumpsit of risk by deceased is concerned.

[2] Before passing upon the question as to whether defendant company was guilty of negligence in causing the death of Mr. Gray, it becomes necessary for us to fix his status, while he was upon the premises of defendant company. It is conceded that he was not an employee of that company. Plaintiff contends that he was an invitee of defendant company, and that said company, there-

fore, was under the obligation to exercise ordinary care to avoid any injury to him. Defendant company, on the other hand, asserts that he was a mere licensee, and that it owed no duty to him as such, save that it should not allow him to run upon a hidden peril, or wantonly, or willfully cause him harm.

In determining whether the deceased was an invitee or mere licensee, it is necessary to consider all the facts and circumstances of the case.

Mr. Gray was not only the salesman of the Texas Oil Company, but he was also an engineer and expert on the application of lubricants.

He was present at the launching of the ship Gauchy, boat No. 1, in September, 1919. Because of defective greasing of the slideways, the first attempt to launch this vessel had been a failure, and the vessel stuck halfway down the ways, and Mr. Gray's aid was then sought by defendant company.

Mr. I. L. Brown, hull foreman at defendant company's plant, testified:

"As near as I know, when boat No. 1 stuck in the ways, Mr. Prochaska, Mr. Johnson, and Mr. Crosby, works manager of the yard at that time, went after Mr. Gray to change the grease on the ways, and I can particularly swear that Mr. Gray spent a night, and, I believe, also a day, experimenting with the three aforesaid officers of the Foundation Company with different greases on the sliding ways."

C. V. Fanning, general superintendent of the Foundation Company, testified that "Mr. Gray was there sort of supervising the application of the grease which he was furnishing for the job," that they worked all Friday, and all day and all night Saturday, and that Mr. Gray slept in witness' office on the table and took his meals at the plant.

This witness testifies that the grease was applied under Mr. Gray's supervision, that he was on the ways, and under the vessel, and that the work required him to go under the vessel. The vessel was successfully launched.

Mr. Gray was also present at the launching of boat No. 2, the ship Lagrange, in October, 1919.

Mr. Fanning, general superintendent of the Foundation Company, testified that the grease was heated up and applied under the supervision of Mr. Gray; that applying the grease also consumed six or seven hours. This work required the labor of 25 or more men and shipwrights.

It is clear that Mr. Gray was not a mere licensee at the first and second launchings of the vessels of defendant company. He was more than a mere invitee, as he actually assisted in work necessary to be done preliminary to these launchings. He was a collaborator with the employees of defendant company upon both of these occasions.

In the light of these facts, we find it difficult to consider Mr. Gray, who was present November 19, 1919, at the launching of the third boat, the Laplace, as a bare licensee, a mere visitor and unknown stranger on the premises of defendant company.

It is true that Mr. Gray did not furnish the grease at this third launching; yet he was an expert in lubrication, employed as an engineer salesman by the Texas Oil Company, and his inspection of the ways, and opinion as to their condition, prior to such launching, would have been of itself of value to defendant company, and he was invited by Dr. Prochaska to make this inspection, and his aid and assistance in this respect was expressly solicited.

The testimony of Weissner, draftsman and steel chaser, is to the effect:

That he first saw Mr. Gray about an hour before the launching, when Mr. Gray and Dr. Prochaska were in conversation, and that Dr. Prochaska asked Mr. Gray to go under the boat and "take a look to see if the grease was working"; that Mr. Gray agreed, and Prochaska and Gray and witness went under the vessel and remained about 20 minutes.

"Q. What did they do during that time?

"A. Just inspected the main slideways there, the both lengths of the ship, both sides, port and starboard.

"Q. How long was that before the boat went down?

"A. About half an hour before.

"Q. What was Mr. Gray doing during that time?

"A. He was conversing with Dr. Prochaska about the grease, how it worked after the load of the ship got down on top of the sliding ways."

This witness states that after they came out Dr. Prochaska and Mr. Gray were conversing together, and they went under the vessel again. Witness says:

"The second time they went under, Dr. Prochaska asked Mr. Gray to give one more inspection. That I know for a positive fact because I was with them."

Dr. Prochaska was not a mere ordinary workman in the employment of defendant company. He was the chief marine architect, the chief draftsman and designer of the Foundation Company, and had designed its launching ways upon which the accident occurred.

Mr. Bacon, works manager, testified:

That Dr. Prochaska "had his duties as chief hull draftsman, and at the launchings he had the duty of going down to see whether the ways were all right; his duty was to inspect."

Dr. Prochaska, as shown by the testimony of Weissner, had made two inspections of the ways with Mr. Gray to see the condition of the grease on the day that the Laplace was launched.

Superintendent Fanning testified as follows as to the duties of Dr. Prochaska:

"Q. Was the inspection of the ways and the manner in which the grease had been applied part of his duties?

"A. He used to always do it.

"Q. And he did it on the first [launching]?

"A. Yes, sir; he did it on the first, second, and third; that is, he or somebody he appointed under him."

Mr. I. L. Brown testified that he was hull foreman for the Foundation Company in 1919, that Dr. Prochaska was introduced to him as a marine architect, and that he had taken orders from him and nearly every man in the yard had.

This testimony clearly shows that Dr. Prochaska, as chief marine architect, was the head of his department; that he had authority to issue orders to the men in the yard; that his special duty was to inspect the ways and see the manner in which the grease was applied; that he had designed these ways; and that their efficiency was under his immediate control. Necessarily he had authority to go under the vessel for this purpose and to take with him a lubricating expert, should he deem it necessary.

Mr. Bacon, works manager, testified that he saw Mr. Gray on the ways a short time before the accident, and had a conversation with him. Mr. Christiansen, chief rigger talked with him; and Dr. Prochaska invited him to inspect the ways, evidently seeking his aid and advice. Yet not a word was said by any of these officials to indicate that Mr. Gray as a guest should go outside of the ropes, or that his presence on the ways or under the vessel exceeded his lawful rights on the premises. In addition to all this, Mr. Gordon, of the Foundation Company, telephoned to the main office of the Texas Oil Company for Mr. Gray on the day before the launching, requesting Mr. Gray to hurry to the plant.

Under this state of facts, Mr. Gray was evidently an invitee of defendant company. Mr. Gray went to the shipyard only after a telephone message from an employee of defendant company. He was not voluntarily there merely as a sight-seer for his pleasure or for any purpose of his own, but he was on the premises inspecting these ways upon the request of the chief marine architect; he was there in connection with the business of the defendant company in launching a ves-

sel; and the inspection was for their assistance and benefit, as but little of the grease used upon this occasion came from the Texas Oil Company, Mr. Gray's employer.

As we said in the case of Bell v. Houston & S. R. Co. et al., 132 La. 88, 60 South. 1029, 43 L. R. A. (N. S.) 740:

"To come under an implied invitation, as distinguished from a mere license, the visitor must come for a purpose connected with the business in which the occupant is engaged, or which he permits to be carried on there. There must at least be some mutuality of interest in the subject to which the visitor's business relates, although the particular thing which is the subject of the visit may not be for the benefit of the occupant."

Mr. Gray did not go to the shipyard of the defendant company on the day of the accident for the purpose of selling any grease to said company. He did not go there at all, as a matter of individual wish or choice, but was telephoned for by any employee of the defendant company. The only business in which we find him engaged is the inspection of the ways at the special request and upon the express invitation of the chief marine architect.

[3] Evidently this was the purpose for which he was called to the plant of the defendant company. His aid and advice as a lubricating expert was sought for the benefit of the Foundation Company, and by this act of the officials of said company all exemption from liability, even if any existed, under said free pass, was waived, even if his status had been fixed at the time of issuance of said pass by the conditions thereof as a mere licensee, and even if the employee who telephoned him to come to the plant was not a general agent of said company, and was without authority to extend to Mr. Gray the invitation of defendant company to visit its premises.

[4] Defendant company, therefore, owed to deceased, as its invitee, the duty of exercising reasonable or ordinary care not to injure him through any act of negligence on its part.

[5] The testimony shows that the vessel was launched before time and tore itself loose.

The time set for launching was 4:30, and she went down, according to the testimony of Chief Rigger Christiansen, about 4:20.

General Superintendent Fanning, when asked if the vessel was launched before time, said:

"I have forgotten the amount of time. I should judge about 15 minutes, because the side keel blocks were out, that is, the most of them were out, and the next job to do was to saw the ways off."

Mr. Fanning further testified that they did not get all of the side keel blocks out before the ship launched; that there was one on the starboard side and two on the port side.

Chief Rigger Christiansen testified that a ship ought not to move on the ways until the ways were sawn off, and, if a ship does move before this is done, there is something wrong.

Chief Carpenter Janseen testified that he had men there to saw through the timber that was holding or locking the slideways together, and that the vessel pulled loose before they started sawing at all.

Chief Carpenter Janseen testified that he han seen 17 launchings in this country and a number in the old country. General Superintendent Fanning testified that he had seen 50 or 60 launchings. General Superintendent Bacon had witnessed a number of launchings also. None of these witnesses had ever seen a boat pull herself loose before the boat ought to have gone down the ways.

This testimony shows conclusively that, after all the blocks are removed and the vessel rests upon the ways, it should not launch itself, but that before it is launched the ways must be sawn off, and that a vessel tearing itself loose is a most unusual or extraordinary occurrence.

In article XI of its answer defendant company admits:

"That while said Gray and Dr. Prochaska were beneath the vessel, the iron straps holding the sliding ways parted and the vessel slid down the ways pulling with her the cables and blocks on which she rested, which resulted in killing the said Gray and Dr. Prochaska."

Chief Carpenter Janseen testified that four bolts broke in the straps holding the sliding way and permanent way together, and that this caused the vessel to pull loose.

General Superintendent Fanning also testified that the pulling out or cracking of these bolts caused the ship to be launched prematurely, as the strain was too great, when the weight of the vessel rested on the ways after the removal of the blocks.

Hull Foreman Brown testified that the bolts pulled through the fish plates. He said:

"The ways in New Orleans was laying at a declinity of five-eighths of an inch to the foot. The way they were fabricated, they could not hold up a boat of the La Palmatere type with those fish plates and bolts."

The testimony shows that there was a trigger at the plant available for use at the launching of the Laplace, that Chief Carpenter Janseen had cut through the ways to put the trigger in, but that Mr. Bacon, works manager, cut out the use of the trigger against Mr. Fanning's protest. He testified:

"I told them I didn't think it was practical to undertake to launch the vessel with the construction of the ways the way they were without the use of the trigger. He [Bacon] said it was not necessary, and told Janseen that he could not use it."

Hull Foreman Brown also testified that Mr. Bacon, works manager, discontinued the use of the trigger "much against the wishes of Mr. Fanning and myself."

General Superintendent Fanning defines a trigger as:

"A contrivance to hold the boat to launch her at a stated time, within a minute or a second or so, or whatever time is set for the ship to be launched." "The purpose of the trigger," says this witness, "is to control the time of launching as much as possible."

Triggers were used in launching boats No. 1, No. 4, and No. 5. None were used on No. 2, and on No. 3, the Laplace.

No. 4 was about a minute late in launching, and No. 5 about 20 minutes slow. Chief Carpenter Janseen testified:

"But the trigger we used on No. 4 and No. 5 was not for to hold the boat; it was to secure the men that was working under the boat."

The trigger, from the testimony, is evidently used as a kind of safety device, in that it controls the time of launching.

The failure to use this trigger, when the testimony shows that the ways were not constructed to launch vessels of the heavier type, by the method used in the launching of the Laplace, and when the testimony further shows that the bolts used to connect the sliding ways with the permanent ways were not sufficiently large and strong to resist the weight of the vessel, when it rested upon the ways, constitutes, in our opinion, negligence on the part of defendant company, as the danger of accident was foreseen by the hull foreman and the general superintendent at the time, and the discontinuance of the use of the trigger on vessel No. 3, was protested against by them.

[6] While defendant company gave warning to its workmen under the vessel before the ship broke away, yet evidently this warning was not heard by Mr. Gray or by Dr. Prochaska, as neither would have remained in a situation of such danger after being notified. In addition to warnings by word of mouth to be given to employees of defendant company, written orders were issued for signals to be given prior to the launching by the blasts of two Klaxon horns, and these orders, of date October 17, were in effect for the launching of the Laplace.

These orders read:

"Two horns will be provided and will give signals to start and stop wedging up and saw-

ing off. At two blasts, men will start wedging up and at one blast they will stop. At three blasts all men will stand clear of the ship and sawing off will start."

Superintendent Bacon admits that the final signal, three blasts of the Klaxon, was not given, because the ship was breaking away.

Chief Rigger Christiansen testifies that no warning was given except by each gang foreman to his own gang, and that there was no warning by the blowing of the horn.

Mr. Weissner testifies that there was not any warning given by the Klaxon, and that the ship went off before any sound was made.

As both Dr. Prochaska and Mr. Gray had a right to rely upon these signals by the Klaxon for their protection and safety, and as no such signals were given them as a warning of danger, it cannot be contended that they were negligent in remaining under the vessel, as there is no proof that either was aware of the defective construction in joining the sliding way to the permanent way.

Mr. Gray was a salesman and land engineer for the Texas Oil Company. He had had no experience at launchings except on two prior occasions at defendant's plant. He was asked to inspect the grease on the launching ways by the chief marine architect, Dr. Prochaska, and accompanied him and a draftsman under the vessel. At other launchings he had been repeatedly under the vessels. The time of the launching was 15 minutes off, and the signal of the Klaxon had to be given. He could not be held at fault in relying upon the greater knowledge of defendant company's experts in shipbuilding, who accompanied him. The last clear cause of the accident was the breaking down of the appliances for holding the vessel 15 minutes before the time fixed for the launching. Had the breaking not occurred and the intended warning signals been given, he would have been safe.

[7] As plaintiff is entitled to recover in her own behalf and as the natural tutrix of her minor children, it becomes our duty to fix the quantum of damages.

Plaintiff, appellee, has answered the appeal and prayed for an amendment of the judgment, increasing the amount of same in favor of the minors. The case is somewhat similar to the Eichorn Cases, 112 La. 251, 36 South. 335, 104 Am. St. Rep. 437, and 114 La. 712, 38 South. 526, 3 Ann. Cas. 98, in which we awarded the widow $10,000, and the seven minor children of the deceased $7,000. The difference between these cases and the present case is that Eichorn left community property, real estate, valued at $10,000, and a life insurance policy of $2,000, which the widow collected. The ages of Eichorn and Gray were about the same and their earnings about equal. While it is true that Gray left no property, and was in debt to the amount of $600, his widow has collected a policy of $1,800, and the eldest child is now 19 years of age, and the next in age is 15 years old, and the widow herself has an earning capacity. The jury, in fixing the amount of the verdict, evidently took into consideration all the facts and circumstances of the case, and we are of the opinion that the sum fixed by their verdict meets the ends of justice.

The judgment appealed from is therefore affirmed at cost of appellant.

Rehearing refused by Division C, composed of Justices DAWKINS, ST. PAUL, and THOMPSON.