Nos. 580-581

First Circuit

KERN v. KNIGHT ET AL.

(March 5, 1930. Opinion and Decree.)
(April 14, 1930. Rehearing Refused.)

McCoy, Moss & King, of Lake Charles, attorneys for plaintiff, appellee.

E. L. Stewart, of DeRidder, and P. L. Ferguson, of Leesville, attorneys for defendants, appellants.

MOUTON, J. In the above-entitled cases the district judge rendered the following opinion:

"On July 21, 1928, Clebert C. Kern, husband of petitioner, Mrs. Leo Cadie Kern, and father of the minors Howart, Bertha, Robert and Marcus Kern, was run over and killed by an automobile owned by Dr. J. A. Knight, but driven by his minor son, Leo Knight, who was living with his father at the time.

"The accident happened on a dark night, while the defendant, Leo Knight, a 16 year old minor, was driving a Chrysler 70 (Dep. of Norwood) west on the De Ridder-Merryville road, which runs, at the point of the accident, in an easterly and westerly direction.

"Shortly prior to the accident, Clebert C. Kern, traveling east in a Dodge sedan, in attempting to go around another car, had a slight collision with a Ford truck, owned by Louis Fruge, and being driven in a westerly direction. Kern parked his Dodge sedan well to the right, or south of the road, a couple of feet from the ditch (Pillsbury, Tr. 23, 24, 41, 44), and Louis Fruge parked his truck, headed west, on his right, or north side of the road, with his right front wheel in the ditch, and

with the rear of the truck 'slightly angling' toward the center of the road (Fruge, Tr. 119, 120; Sandal, Tr. 227, 228; Pillsbury, Tr. 25, 38, 45, 46). The rear end of Fruge's truck was 54 or 55 feet east of a point opposite the front end of Kern's Dodge sedan. A Ford roadster came west between the cars above mentioned, and the car of Hugh Hurst, which was parked well on his right or south side of the road, and 31 feet west of a point south of the front end of the Fruge truck (Pillsbury, Tr. 26, 290; Crier, Tr. 290), and parked on his right, or the north side of the road, 126 feet west of the front end of the Fruge truck. (Pillsbury and Crier, Tr. 26, 42, 290, 293, 294.) Estimating the length of the Dodge sedan and the Fruge truck at 14 feet each, there was 85 feet between Kern's Dodge sedan and Hurst's car on the south side of the road, and there was 126 feet between Fruge's truck and the Ford roadster on the north side of the road.

"Other witnesses differed with Crier and Pillsbury in their estimates of the distances between the cars, but the former were unable to agree among themselves, and I feel certain that Crier and Pillsbury have located correctly the various cars. These witnesses are disinterested, intelligent, had good opportunities to fix the location of the cars, and this they did with reference to easily recognize objects on the ground, and which they testified they remembered.

"Defendants, during the trial, sought to show that Kern was injured in the first collision, and not in the second with Leo Knight. There is nothing in the record to support this contention. Moreover, Leo Knight admitted that he struck a man. The collision between the Kern car and Fruge's car was slight, and Kern was not then injured in even the slightest degree. (Pillsbury, Tr. 24, 33, 39, 287; Crier, Tr. 77, 94; Fruge, Tr. 102, 113, 133; Henry, Tr. 143.)

"Clebert C. Kern received two wounds, from either of which he would have died. (Dr. Love, Tr. 4.) One of the wounds was as wide as one's hand, and cutting the right side and front of the abdomen open, it extended as a punctured wound some inches past the middle line of the abdomen. Kern's skull was badly fractured also.

"All of the witnesses agree that, after Kern had the slight collision with the Fruge truck, he walked around, absolutely uninjured, talking and acting as any normal man. He could not have done this had he received either of the wounds in the first collision.

"As the four cars were located on the road, there was ample space for other cars to pass between them, and one Chrysler and the Ford roadster actually went through without trouble. (Fruge, Tr. 103, 134, 126; Henry, Tr. 137, 144; Crier, Tr. 73, 76, 90; Pillsbury, Tr. 26, 37, 41, 58.) In fact, there was so much room that it was not necessary to move from beside the Hurst car as the other cars went by (Fruge, Tr. 126), and some of the witnesses did not move from the Hurst car as the others went by (Pillsbury, Tr. 58).

"There is nothing in the record to show the total width of the various cars, but the court takes judicial notice of the fact, which is common knowledge, that the distance between the centers of automobile wheels is 4 feet, 8 inches. If the total width of each of these cars was 6 feet, and if the Hurst car had been directly south of the Fruge truck, there would still have been 2½ feet left on each side of the Chrysler 70 coupe as it went between the Hurst and Fruge cars, for the crown of the road at that point was something over 23 feet wide. (Tr. 290, 293, 294.) The Hurst car was not opposite the Fruge truck, and there was ample room for a car to pass between them without turning in any way. (Henry, Tr. 153.)

"All four of the cars had their lights burning as they were parked on the road, at the time of the accident. The left front light of the Fruge truck was out, but the other front light and the tail-light were burning. (Pillsbury, Tr. 28, 29, 47.) Crier remembered that the head lights on the Hurst car, and the tail lights on the Fruge truck and the Ford roadster were burning. (Tr. 70.) Fruge recalled that the tail-light and one headlight on his truck were burning. (Tr. 104.) Henry also remembered this. (Tr. 104.) Smith testified that the lights on Kern's Dodge sedan were burning. (Tr. 202.)

"Just prior to the fatal accident Kern was standing on the north side of the Hurst

car, talking with Crier, Fruge, Hurst, Mrs. Hurst, and Pillsbury. (Tr. 27, 38, 49, 87, 84, 98, 107, 138, 150.) When the Chrysler 70 coupe approached, Kern was standing in the road, with his foot on the north running board or fender of the Hurst car. (Crier, Tr. 68, 92, 98, 99.)

"One witness testified that Kern, at the time, had one foot (evidently his left) on the running board of the Hurst car, with his back toward the on-coming Chrysler. (Tr. 33, 34.)

"With Kern in this position by the side of the Hurst car, and with all four of the cars, in the location shown, and with the lights of all of them burning, the Chrysler was seen approaching several hundred feet away, at a rapid rate of speed. Crier, who was standing in the road with a flashlight lantern (Tr. 54), ran up the road some distance, signaling the Chrysler to stop (Tr. 29, 53, 54, 55, 71, 72), and then ran off the road (Tr. 88, 97), but it appears no attention was paid to the signals.

"The record absolutely shows that Leo Knight approached the parked cars at a highly excessive rate of speed. The defendant, Leo Knight, says that he was driving 35 miles an hour (Tr. 264), and Sandal, who was riding with him, says Knight did not slow up until he saw the truck (Tr. 229), and, according to Knight, he was then on it. Smith, who was also with Leo Knight, estimated the speed at 30 or 35 miles per hour (Tr. 198), and Crier estimated the Chrysler's speed at 45 miles per hour, and noticed no slowing up. (Tr. 71, 90.) Fruge, Pillsbury, and Henry could not estimate the Chrysler's speed, but said it was 'pretty fast.' (Tr. 29, 127, 140.)

"When Leo Knight put on the brakes, he skidded and struck the Fruge truck, knocking out its tail-light. He then skidded to the south side of the road, struck and knocked the Hurst car into the ditch, then, continuing to skid and sway toward the north side of the road, went about 80 feet farther, struck and knocked the Ford roadster into the ditch, and then continued some distance down the road.

"From the front part of Kern's car to the back of the Ford roadster was 194 feet, estimating the length of the Fruge truck at 14 feet. With the gas cut off, and the brakes on most of the time, the Chrysler 70 coupe struck three cars, knocked two of them in the ditch, and not only traveled the 194 feet, but rolled some yards farther before coming to a stop. This all indicates a very high rate of speed. That Knight's rate of speed was excessive is plain, and it is equally plain that it was gross negligence to approach four lighted cars, grouped on the roadside as were these cars, at such a rate of speed. A person seeing parked automobiles on the roadside should exercise extraordinary care in approaching them, and, failing to do so, is guilty of negligence. Daigle v. Plaisance, 7 La. App. 439.

"Negligence having been shown on the part of the defendant Leo Knight, the burden then rested upon the defendants to show affirmatively, contributory negligence on the part of the deceased, in order to avoid a recovery. In the case of Buechner et al. v. City of N. O., 112 La. 599, 36 So. 603, 66 L. R. A. 334, 104 Am. St. Rep. 455, this rule was firmly and finally established, and has never since been departed from.

"There was no evidence to show any negligence on the part of the deceased, but defendants urge that since several other men, who were standing nearby and talking with the deceased, saw the on-coming car, and got out of its way, and, since there was no reason why the deceased could not have seen the Chrysler, it must be presumed that he saw it, and was negligent in not leaving the road with the others.

"There is no such presumption of law as that contended for by the defendants, as will be shown, but to indulge in an inference of fact in regard to negligence, from those set forth in the preceding paragraph, it would first have to be shown that Kern actually saw or heard the approaching Chrysler, and no such showing was made.

"Just how Kern was killed, or where he was at the exact instant he was struck, does not appear from the record. One of the witnesses, Henry, did not see the Chrysler until it was only 50 or 75 yards away. (Tr. 139.) At one time, almost immediately before the accident, Kern had his back to the approaching Chrysler, as has already been shown. Taking into consideration this fact, along with the fact that Kern's wounds indicate he must have been struck first in the right side, it would

seem that it is probable he remained with his back toward the Chrysler until it was almost on him, and that when he turned to his right to move, he was struck and killed.

"Since the burden of showing contributory negligence is on the defendants, the law presumes the instinct of self-preservation in the deceased caused him to look and listen, and to exercise due care under the circumstances, a rule absolutely in contravention of the one contended for by the defendants. Aymond v. Western Union Tel. Co., 151 La. 184, 91 So. 671.

"Leo Knight claims that the lights from the Kern Dodge sedan blinded him, and prevented him from seeing the other cars on the road, and that the act of Kern in leaving his car parked in a location where the lights would prevent a traveler from seeing other cars back of it, was one of negligence on the part of the deceased. In the first place, I do not believe that the lights from Kern's car kept young Knight from seeing the other three cars and the signalling flash-light lantern. The red tail-light of the Fruge truck must have been visible to one keeping a lookout, and so must the lights of the Hurst car, some 85 or 86 feet west of the Kern car. If the Fruge truck was 'angling' across the road, as defendants claim, then, its headlight, pointing out to the north west, and away from the road, must have been clearly visible.

"The Kern car was well to the right side of the road, and its lights could not possibly have blinded Leo Knight after he got within 75 feet of it, if he had been on his right, or the north side of the road. When 75 feet from the Kern car, Leo Knight was 130 feet from the Fruge truck, which he should have seen with his own lights, in ample time to stop, even if he had not seen the truck's tail-light at a farther distance.

"Even if it be true that the driver of the Chrysler 70 coupe failed to see the other cars because of blinding lights on Kern's car, this would be no defense. The Court of Appeal has decided this exact point adversely to defendant's contention. Alston v. Cooley, 5 La. App. 623.

"It has already been shown that Leo Knight's vision was not obstructed by the Kern car so as to prevent him from seeing the Fruge truck and other cars, all with burning lights, on the road, but, even if his vision had been so obstructed, his conduct in driving at such reckless speed down a public road, regardless of whether or not he could see, was the grossest sort of negligence, and for which he is liable. Daigle v. Plaisance, 7 La. App. 439. In the case of Ward v. Donahue, 8 La. App. 335, the defendant sought to avoid damages for running over a pedestrian in a street, by urging that he was blinded by the light of an approaching car. In holding the defendant liable, the court said:

"'It being his (the defendant's) duty to look ahead always and having no right to assume that the street or road is clear, it follows necessarily that when the driver finds himself so blinded, from whatever cause, that he cannot see in front of him, he assumes the risk of injuring those who may be in the street.'

"In the case of Alston v. Cooley, 5 La. App. 623, supra, the court held that, even if the blinding lights came from the plaintiff's own automobile, that fact was no defense to defendant's negligence.

"Dr. J. A. Knight urges that he is not liable for the acts of his minor son, for the reason that the doctor had forbidden his son ever to use the car without special permission, and that on the occasion of the accident the doctor had given no permission to his son to use the car, and did not know that his son was going to use it then.

"Leo Knight testified that he frequently drove all three of his father's cars, and that, while his father had forbidden him to drive a car without special permission, he did so drive them. The doctor should have known that his son was driving his cars without permission. He had the custody of the cars, and he had control over his minor son.

"Civ. Code, articles 2317 and 2318, read as follows:

"'Art. 2317. *Liability for Acts of Others and Things in Our Charge.* We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to

be understood with the following modifications.'

" 'Art. 2318. *Id. Acts of Minors.* The father, or after his decease, the mother, are responsible for the damage occasioned by their minor or unemancipated children, residing with them, or placed by them under the care of other persons, reserving to them recourse against those persons.

" 'The same responsibility attaches to the tutors of minors.'

"A father has it within his power to prevent his own son from driving automobiles, and since no one else has this power, the father is liable for damages done by his minor son, whether he is engaged in some undertaking with or without his father's consent.

"The law in these cases imputes a fault to the father, which is presumed to have resulted from lack of sufficient care, watchfulness and discipline on his part, in the exercise of his parental authority.

"The Supreme Court, in interpreting article 2318 of the Civil Code, quoted above, holds it is not necessary to show the parent's knowledge or consent to his minor's course of conduct, in order to hold the parent liable for his minor's negligence. Sutton v. Champagne, 141 La. 469, 75 So. 209; Mullins v. Blaise, 37 La. Ann. 92; Rush v. Town of Farmerville, 156 La. 857, 869, 101 So. 243.

"Counsel contends that the 16-year old minor under no circumstance can be liable, even for the results of his negligence. This is contrary to the provisions of the Civil Code, which expressly provides that a minor is liable for his torts. Civ. Code, art. 1785, par. 5; Civ. Code, arts. 1874, 2227. The state, in enforcing its criminal laws, may take a 16 year old minor's life for the commission of a capital crime. If a minor may be held responsible to this degree for the violation of the laws of his country, there is no good reason why he should not be compelled to make good the damage he does in violating the rights of others.

"The defendant Leo Knight pleads the prescription of one year, based upon the fact that a tutor ad hoc was not appointed, and service upon such tutor ad hoc was not had until one year from the date of the accident. However, Leo Knight was sued jointly with his father, and a judgment in solido was asked against them both. One of the citations, and the petition, was served before the expiration of one year, upon Leo Knight and upon Dr. Knight, his father. I am of the opinion that these services interrupted the running of prescription.

"Since Leo Knight and Dr. Knight are obligated in solido for damages done the plaintiff, service on Dr. Knight interrupted prescription as to Leo Knight. Civ. Code, art. 3552, par. 1, reads as follows:

" 'Id. (Interruption). *Debtors in Solido; Heirs.* A citation served upon one debtor in solido, or his acknowledgment of the debt, interrupts the prescription with regard to all the others and even their heirs.'

"There are a number of decisions holding that the interruption of prescription as to one in solido obligor, under a conventional obligation, interrupts prescription as to the other in solido obligors. Continental Supply Co. v. Fisher Oil Co., 156 La. 101, 100 So. 64. The language of the Code is broad enough to cover tort cases, and the Supreme Court has so held. Frazier v. Hardee, 21 La. Ann. 541. In the case of Becnel v. Waguespack, 40 La. Ann. 109, 3 So. 536, the court held that service of a petition of one co-owner of land, for damages to the land, interrupted prescription as to the other co-owner.

"Clebert C. Kern was 44 years old at the time of his death. (Tr. 159.) He had a life expectancy of 25.27 years, and an earning capacity of $10,000.00 per year. (Tr. 160, 166.) Kern left four minors at his death, their names, and ages at that time, being Howart Louis Kern, age 16 years; Bertha Agnes Kern, age 15 years; Robert Joseph Kern, age 12 years; and Marcus Thomas Kern, age 6 years.

"In the case of Gray v. Foundation Co., 151 La. 7, 24, 91 So. 527, the court allowed a widow and four minors, two of whom were 15 and 19 years of age, the sum of $15,000, the widow in this case having an earning capacity.

"In Blackburn v. Louisiana Ry. & Nav. Co., 144 La. 520, 80 So. 708, a judgment of $15,000 was given a widow and two minor children for the death of the husband and father, who was 32 years old, earning $100 per month.

"The court allowed a widow damages in the sum of $10,000 for the death of her husband, who was 67 years old, and who had an earning capacity of $30.00 per week, in the case of Rose v. L'Engle, 148 La. 310, 86 So. 822.

'For the death of a husband and father 54 years old, with a life expectancy of 18 years, and an earning capacity of $150 per month, the widow was allowed $10,000 and her 13 year old child was allowed $5,000, in the case of Feely v. National Packing Co., 141 La. 903, 75 So. 837.

"In the case of Jones v. Kansas City Southern Ry. Co., 137 La. 178, 68 So. 401, a widow was allowed $5,000, a 7 year old boy $3,500, a 6 year old daughter $4,000, and a 2 year old boy $5,000. In this case, nothing was allowed for the suffering of the deceased, nor for the mental anguish of the plaintiffs, as the case was brought under the federal statutes.

"It was held in Bourdier v. Louisiana Western R. Co., 131 La. 689, 60 So. 78, that the widow of a 28 year old station foreman was entitled to $10,000 for his death. For a large list of cases showing the awards in cases similar to those above cited, and to the case at bar, see Johnson v. Hibernia Bank & Trust Co., 5 La. App. 649.

"Taking into consideration Kern's earning capacity of $10,000 per year; his life expectancy of 25.27 years; his great suffering for many hours; the net inventory of his share of the community property amounting to $19,373; insurance in the sum of $6,000 payable to his estate, and $22,00 to his widow and all of the relevant facts bearing on the question of damages, the court will allow a judgment in favor of the widow for $7,000, and a judgment in favor of the natural tutrix, for the benefit of the minors, in the sum of $10,000, which last named amount is to be divided among said minors, according to the length of their respective minorities. See Eichorn v. New Orleans, etc., Co., 114 La. 712, 726, 38 So. 526, 3 Ann. Cas. 98."

In the foregoing opinion we find a thorough, correct, and comprehensive analysis of the facts in these consolidated cases; also a proper application of the rules of law governing the issues therein presented for solution.

An opinion by this court on the contested points presented on this appeal would result only in the repetition of what has been said by our learned brother of the district court.

Counsel for defendant is, however, so insistent on some legal points involved in the case that, notwithstanding our acceptance of the conclusions of facts and law reached below, we shall give our attention to the questions thus urged in defendant's brief.

In referring to article 2318, Civ. Code, which holds the father, or, after his decease, the mother, responsible for the damage occasioned by their minor, counsel says: This article "does not make them jointly liable, but makes them solidarily liable." In the opinion of the district judge hereinabove reproduced, as we understand it, Dr. Knight and his minor son, Leo Knight, were held in solido for the damages claimed, and in this respect there was no error committed by the lower court. In connection with the foregoing contention, counsel also contends that he has been unable to find where our courts have ever passed on articles 1785, 1874, and 2227 of the Civil Code, and that, as he construes these articles, the unemancipated minor cannot be held for damages resulting from his offenses or quasi offenses. In commenting on these articles of the Code, Marcade, vol. 4, p. 672, says: "Un mineur s'oblige tout aussi bien qu'un majeure par ses faits illicites"—meaning, roughly translated, that the minor is equally bound as the major for his illegal acts or for his offenses or quasi offenses. As we construe these articles, the minor is responsible individually for the damages resulting from his acts in such cases.

Another contention of counsel for defendant is that in the petition served on the defendants there is no allegation of the necessity for the appointment of a curator ad hoc. Counsel contends that such an averment was essential, and, for the want of such an allegation, his exception of no cause of action should have been maintained. Such an averment in the petition, in our opinion, was not indispensable or sacramental to the cause of action set out by plaintiff against Dr. Knight and his son, Leo, for the damages claimed against them in solido. The petition in which the damages were so claimed was served before the expiration of one year from the commission of the act complained of; and, as said below, interrupted prescription under article Civ. Code, art. 3552.

For the foregoing reasons and those given in the opinion of the district judge, the defendants were correctly held liable in solido.

We are of the opinion, however, that the judgment of $7,000 in favor of the widow should be reduced to $6,000, and the judgment in favor of the natural tutrix for the minors should be reduced to $8,000, and, as thus amended, affirmed.

It is therefore ordered, adjudged, and decreed that the judgment in suit No. 2559, district court, in favor of Mrs. Leocadie Kern, widow, be and is hereby amended by reducing it to the sum of $6,000; and that the other judgment in suit No. 2560 of the District Court, in favor of Mrs. Leocadie Kern, tutrix for the benefit of the minors, be and is hereby amended by reducing it to the sum of $8,000; and, as thus amended and reduced, that the two judgments be and are hereby affirmed, with cost.

LECHE, J., not participating.