95 So.2d 860 (1957)
Pete J. CUSH, Plaintiff-Appellee,
v.
Isadore L. GRIFFIN et al., Defendants-Appellants.
No. 8604.
Court of Appeal of Louisiana, Second Circuit.
February 5, 1957.
On Rehearing June 28, 1957.
*861 Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, for appellants.
Love & Rigby, Shreveport, for appellee.
GLADNEY, Judge.
Suit was instituted by Pete J. Cush to recover damages arising from collision *862 between an oil tank truck and plaintiff's motorcycle which occurred December 10, 1955 about 2:00 o'clock p. m. at the south end of the North Market Street bridge which crosses Cross Bayou, in Shreveport, Louisiana. Made defendants were Isadore L. Griffin, the driver of the oil tank truck, Massie & Matthews Oil Company, a partnership and owner of the vehicle, together with Fidelity Phoenix Fire Insurance Company of New York, insurer of the vehicle. After trial on the merits a jury verdict was rendered in favor of plaintiff in the amount of Nineteen Thousand Nine Hundred Forty-Eight and 51/100 ($19,948.51) Dollars. From the verdict and judgment so rendered, defendants have appealed.
At the time of the accident Griffin was driving the tank truck south along North Market Street toward down-town Shreveport. At the place where the street traverses the Cross Bayou bridge, sometimes referred to as the Agurs bridge, the street is divided into four lanes for traffic purposes, there being two lanes for southbound traffic and two for northbound traffic. The thoroughfare accommodates traffic moving over State Highway No. One and Federal Highway No. Seventy-One. Griffin was traveling in the left or east lane for southbound traffic. Plaintiff was riding on his motorcycle on the outside or right lane, traveling in the same direction and somewhat to the rear of the truck. When the truck arrived near the south end of the bridge, the driver turned to his right in an attempt to enter a private road leading off the highway at the south end of the bridge. The motorcycle collided with the right front fender and running board near the cab of said truck. Plaintiff and his motorcycle slid under the body of the truck which, however, moved but a short distance before being stopped after the impact. As a result of the accident plaintiff sustained severe injuries and the motorcycle was damaged.
Plaintiff alleges Griffin was negligent in the following particulars: in suddenly cutting across and blocking the lane of traffic occupied by your petitioner; in suddenly cutting from the left hand lane of traffic across the right hand lane of traffic without any warning or signal whatsoever; in not giving proper indication and signal of his intention to make the turn; in not having the vehicle he was driving under absolute control while making said turn; in making a right hand turn from the center lane of the street and not from the lane nearest the right hand curb, in violation of the Louisiana State Highway Regulatory Act and Ordinance Number 207 of 1923 of the City of Shreveport, Sections 44 and 47; and in not keeping a proper lookout.
By way of defense defendants deny that Griffin was at fault and assert that the accident was due to the negligence of plaintiff. Defendants aver that Griffin was proceeding south on the highway at a slow and careful rate of speed and in his proper lane of travel, the right or west lane of the four lane highway, said speed being less than ten miles per hour; that as the truck approached the south end of the bridge the driver turned on his directional signal lights, indicating an intended right turn into the property and street at the south end of the bridge; and when the driver reached the south end of the bridge he turned to the right in accordance with his signal and had partially completed his right turn when the truck was struck by the motorcycle being operated by the plaintiff. Plaintiff is charged with the following acts of negligence as a bar to his recovery: in attempting to pass the truck on the right and at an intersection; in driving his motorcycle at an excessive rate of speed of approximately sixty miles per hour; in not having his motorcycle under control and in not maintaining a proper lookout. Alternatively, defendants plead contributory negligence consisting of the *863 acts of commission and omission enumerated above.
The eye witnesses who testified to the accident included the drivers of the two vehicles involved, Robert M. Smith and Ralph Kelly Gray, two young men who were riding their own motorcycles at the time in company with plaintiff, and J. W. Pittman, a motorist who was following the vehicles involved in the collision. Griffin and Pittman testified on behalf of the defendants and the remaining witnesses gave evidence favorable to plaintiff.
Griffin testified he entered North Market Street some distance north of the bridge, turned south and traveled along the lane nearest the center of the street, proceeding at a speed of about twenty-five miles per hour, and that realizing he wished to turn off of the highway at the south end of the bridge, he attempted to enter the right or west lane of traffic but could not do so because of other vehicles using said lane, and consequently he attempted to edge over and straddle the line dividing the two west lanes of the highway. He testified that when he was about fifteen or twenty feet from the south end of the bridge, and after having turned on his directional lights and giving a hand signal, he attempted the right turn.
J. W. Pittman testified he was not in a position to see whether or not Griffin gave the signals above mentioned, nor could he clearly see the movements of the tank truck. His testimony is simply to the effect that when plaintiff passed him near the off-end of the bridge, which structure is 438 feet in length, he estimated the motorcycles were traveling fifty-five or sixty miles per hour.
Robert M. Smith testified he was riding a motorcycle behind plaintiff and Kelly Gray, and that as the truck approached the south end of the bridge it was traveling in the left lane or lane nearest the center; that he was about twenty feet behind Gray, who was ahead and to the left, and he was also behind plaintiff who was proceeding in the right lane.
Smith's testimony was corroborated by Kelly Gray. Gray stated Pete Cush was in the right lane next to the curb and when the truck arrived close to the south end of the bridge, Griffin commenced a sharp turn to the right.
Griffin admitted that he was in the left lane until fifteen or twenty feet from the end of the bridge, at which time he began to straddle the line dividing the two west lanes of traffic in order to enable him to make the right turn. The opening or passage-way which Griffin sought to enter is narrow and only eight to ten feet in width. The evidence shows that the truck was twenty-two feet in length and Griffin testified that had he been in the right or west lane of traffic he could not have negotiated the sharp right turn at the end of the bridge. Smith, Gray and plaintiff all deny Griffin gave any signal of his intention to turn, and state that he did not turn on his directional signal lights. Griffin said that just before and when he began to make his turn, he looked in his mirror and did not see any of the motorcycle riders. Smith, Gray and plaintiff testified that as they crossed the bridge they were traveling at a reasonable and moderate rate of speed, not in excess of twenty-five miles per hour.
Unquestionably, Griffin was negligent in attempting to cross the west lane of a four-lane highway and make a right turn off of said highway without making certain and sure that he could do so without endangering motorists traveling in the same direction in the lane to his right. He had no right to assume that a motorist using the right lane would not pass to his right and he must have realized that any maneuver across the lane would endanger any approaching traffic from his rear. We are of the opinion he failed to make proper observation to the rear and further that he failed to timely give any signal of his intention to turn to the right. We have carefully analyzed the testimony of Smith, Gray and plaintiff and we have no reason to discredit the testimony to this effect given by *864 these young men. Our conclusion in this respect is supported by the verdict of the jury, for obviously that body must have believed the testimony of these witnesses before rendering their verdict.
The burden rests on appellants to show the judgment appealed from is manifestly erroneous. It is also recognized that on questions of fact involving the credibility of witnesses, the verdict of the jury will not be disturbed unless manifestly erroneous. See Smith v. Parker, La.App.1952, 59 So.2d 718; Rachal v. Texas & Pacific Ry. Company, La.App.1952, 61 So.2d 525; and Selser v. Revol, 1922, 152 La. 447, 93 So. 675.
Having found that by a preponderance of the evidence Griffin's negligence was a proximate cause of the accident, it must be determined whether or not plaintiff was guilty of such negligence as to bar recovery. In support of the plea of contributory negligence defendants' counsel earnestly contend plaintiff was at fault in several particulars.
First, it is charged plaintiff attempted to pass the truck on its right side contrary to LSA-R.S. 32:233, subd. A, which requires the driver of a vehicle overtaking another to pass to the left. The argument is untenable in view of the ruling in Mooney v. American Automobile Insurance Company, La.App.1955, 81 So.2d 625, in which decision the court held that it was never the intention of the lawmakers that LSA-R.S. 32:233, subd. A, should apply to multiple lane highways. Plaintiffs insists that at the time of the collision he was not in fact attempting to pass the truck, but was traveling in the lane to the right of and adjoining the lane in which the truck was traveling, somewhat to the rear, when Griffin turned abruptly across plaintiff's lane of traffic and blocked his way. The evidence does not indicate plaintiff was engaged in passing the truck.
Another contention of defendants is that plaintiff was negligent in attempting to pass the truck at an intersection in violation of paragraph E of LSA-R.S. 32:233, which reads:
"The driver of a vehicle shall not, under any circumstances, overtake or pass another vehicle proceeding in the same direction at any railroad grade crossing or any intersection of the highway, unless permitted or instructed to do so by a duly authorized traffic or police officer."
In substance the argument is that inasmuch as the railroad crossed the highway at the point where Griffin undertook to turn to the right, it was a violation of the statute for plaintiff to pass the truck at that point. Although we have stated above that in our opinion there is no proof plaintiff was engaged in an act of passing when the collision took place, the point is not sound. In Robertson v. Yazoo & M. V. R. Company, 1929, 154 Misc. 182, 122 So. 371, 372, a decision by the Supreme Court of Mississippi, reference is had to the following statement of the law:
"`The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if: (a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and (b) the interest invaded is one which the enactment is intended to protect; and (c) where the enactment is intended to protect an interest from a particular hazard, the invasion of the interests results from that hazard; and (d) the violation is in law the cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action.' Am.Law Inst. Restatement Torts (Tent.) § 176; 45 C.J. 726; St. Louis & S. F. R. Co. v. Conarty, 238 U.S. 243, 35 S.Ct. 785, 59 L.Ed. 1290."
*865 Manifestly, the presence of the railroad tracks had no causal connection whatsoever with the accident.
Nor do we think that defendants have proved that plaintiff was driving at an excessive rate of speed. The testimony of Smith, Gray and plaintiff contradicts the testimony of Pittman. Griffin testified he did not observe plaintiff prior to the accident and, therefore, was not in a position to give any testimony concerning his speed. The remaining charges that plaintiff did not have his motorcycle under control and was not maintaining a proper lookout are not established. We are, therefore, of the conclusion that the plea of contributory negligence urged herein is not proven and must be denied.
Counsel for appellants urge that Callia v. Rambin, 78 So.2d 44, Nichols v. Everist, 80 So.2d 199, and Henry v. T. L. James & Company, 83 So.2d 559, decisions of this court, clearly sustain defendant's position that Cush was guilty of contributory negligence which will bar recovery by him. The decisions cited are inapposite since involved in each of the cited cases was an attempt to pass another vehicle on a two-lane highway or street. The evidence does not show Cush was engaged in passing the truck when it turned in front of him. And, as pointed out hereinabove, it was held in Mooney v. American Automobile Insurance Company, supra, the provisions of traffic laws requiring vehicles overtaking from the rear to pass on the left have application only to two-lane highways and not to multi-lane highways or streets.
The plaintiff sustained severe and painful injuries. When his motorcycle came into contact with the truck, it and its rider slid under the truck which dragged plaintiff over the pavement for perhaps seven or eight feet. He was not immediately unconscious, but after being removed to the North Louisiana Sanitarium remained in a semi-conscious state for some time. He was confined to the hospital from the date of the accident, December 10, 1955, through December 20, 1955. Dr. F. R. Spruill, who gave first aid treatment, testified that Cush was in an irrational, semi-conscious condition and obviously in pain. Dr. Spruill described cuts on the forehead, a puncture wound on each thigh, a laceration on the left arm, a comminuted fracture of the nose, comminuted fractures of the left leg of both the tibia and fibula, contusions to the right knee, a fracture of the skull and other minor bruises, cuts and contusions about the body. He was under the treatment of Dr. Don F. Overdyke, orthopedic surgeon, who set the comminuted fractures of the left leg without surgical intervention and encased plaintiff's left leg in a cast from his hip to his foot, which cast remained on the leg for forty-five days. After removal of the cast the patient resorted to crutches for several weeks before bearing full weight. Plaintiff's right leg also was involved. Dr. Overdyke testified plaintiff sustained a sprain of the tibial collateral ligament and that it was tender with limited flexion for about four months after the accident. The doctor further stated calcium deposits followed in the tibial collateral ligament which will be to some extent permanent. When one of the puncture wounds failed to heal, plaintiff went to Dr. Clint Willis, who removed a fragment of bluejean. As a result of the orthopedic treatments, Dr. Overdyke estimated that plaintiff would suffer fifteen per cent permanent disability to the right leg as a whole, and twenty per cent permanent disability of the left leg as a whole. The injury to plaintiff's nose was treated by Dr. J. L. Custer, an eye, ear, nose and throat specialist. He testified plaintiff sustained a multiple compound, comminuted fracture of the nose, involving the left lateral nasal wall and nasal septum with the left inferior turbinate bone torn loose from its attachment. Dr. Custer said the treatment was very painful and during the period the packing was in his nose, plaintiff had to breathe entirely through his mouth. Testifying further, Dr. Custer said there will be a small permanent *866 scar on plaintiff's nose. He thought that if the torn ligament in the nose should rebow itself, an operation would be required to prevent malfunction of the breathing passages, and to avoid difficulty in hearing in later years.
Plaintiff was also under the care of Dr. Frederick C. Boykin, a neuro-surgeon of high standing in Shreveport, who, in giving his findings, stated that plaintiff suffered a craniocerebral trauma with possible contusion of the brain; that plaintiff was disorientated for a few days and while under his observation at the hospital, suffered intermittent headaches and dizziness. Dr. Boykin did not foresee any permanent effects from these injuries.
The lay evidence offered by plaintiff, including his own testimony, is to the effect that plaintiff still suffers from moody spells and has difficulty in sustaining his posture. His occupation was that of a carpenter, and usually he was employed in roofing. Plaintiff said that as of the time of trial his attempts to continue his employment had been only partially effective.
The testimony of Drs. Overdyke, Boykin and Custer is that plaintiff should not experience any residual disability from the accident except as to his legs. Dr. Overdyke was of the opinion some malfunctioning of both knees would persist, and there would remain a slight deformity to the upper left leg. Their prognoses taken together indicate that when plaintiff has reached a maximum condition of recovery, he should sustain no loss in earning capacity.
Plaintiff claims in damages, besides his medical expenses, $472.16 for property damage to his motorcycle, loss of earnings to date of trial, $1,607, loss of future earnings because of disability $5,000, permanent injuries $17,000, disfigurement, etc. $1,000, pain and suffering, past and future, $15,000 and future medical expenses are estimated at $250. In allowing the sum of $19,948.51, the jury included $2,948.51 for medical expenses, property damage and loss of earnings, and for the remainder of the items the jury allowed the sum of $17,000, which makes the total award of $19,948.51.
We have repeatedly asserted that there is no hard and fast rule for the measurement of damages for personal injuries and the amount to be awarded in each case must be determined from the peculiar facts of that case. We have carefully reviewed the testimony of the medical experts and in our judgment the permanent physical disability as measured by Dr. Overdyke has no direct relationship to plaintiff's earnings in the future. It is true that in the short period of time which has elapsed since the accident, plaintiff has not been able to resume his occupation in the same manner as prior to the accident, but there is nothing in the medical testimony to indicate that he will not in the reasonably near future regain the ability to fully perform the duties of his occupation. By this we do not mean he will not suffer from some discomfort or at times become more easily fatigued than before the accident. We do believe, however, that when he has arrived at a condition of maximum recovery from this accident, he will be restored to substantial earning power. For this reason we believe that the award by the jury is excessive and should be reduced by the sum of Five Thousand ($5,000) Dollars. It follows from the reasons hereinabove set out that the judgment from which appealed should be amended by reducing the same to Fourteen Thousand Nine Hundred Forty-Eight and 51/100 ($14,948.51) Dollars, and as so amended, the judgment is hereby affirmed. Costs of this appeal should be taxed upon appellee.
HARDY, Judge, concurs in the result but dissents on the award, being of the opinion that the verdict of the jury was correct.

On Rehearing
HARDY, Judge.
On application of plaintiff a rehearing was granted in this case restricted to a reconsideration of the quantum of damages as fixed in our original judgment.
*867 The nature of plaintiff's injuries and the effects thereof are set forth in accurate detail in our original opinion and, therefore, will not be reiterated.
The basis for the conclusion reached by the majority of this court, on first hearing, which resulted in a reduction in the amount awarded by the jury was supported by statements in the original opinion which read as follows:
"Their (the medical witnesses) prognoses taken together indicate that when plaintiff has reached a maximum condition of recovery, he should sustain no loss in earning capacity.
"* * * * * *
"* * * there is nothing in the medical testimony to indicate that he will not in the reasonably near future regain the ability to fully perform the duties of his occupation. By this we do not mean he will not suffer from some discomfort or at times become more easily fatigued than before the accident. We do believe, however, that when he has arrived at a condition of maximum recovery from this accident, he will be restored to substantial earning power."
Careful re-examination of the testimony in the record, which directly bears upon the effect of plaintiff's injuries, upon his ability to work, and his earning power, has served to convince us that we were mistaken in our original evaluation of this testimony and in our conclusions, as above expressed.
The medical testimony was furnished by four qualified physicians, all of whom were tendered as witnesses on behalf of plaintiff. The testimony of Dr. Spruill, who first attended plaintiff at the sanitarium to which he was removed following the accident, was pertinent only with respect to the nature and character of plaintiff's injuries and evidence of his pain and suffering, and, therefore, has no particular relevancy to the question with which we are here concerned, that is, the extent and effect of the injuries.
Dr. Custer, an eye, ear, nose and throat specialist, testified with reference to his treatment of the serious and painful compound, comminuted fracture of plaintiff's nose. As pointed out in the original opinion Dr. Custer indicated that future complications might necessitate a subsequent operation upon the nose, and, further, that the injury, after a period of years, might affect plaintiff's hearing.
Dr. Willis testified with reference to his services in connection with the development of tumorous masses in plaintiff's left leg resulting from infection; his removal of foreign bodies and the treatment in connection therewith.
It is upon the basis of the testimony of Dr. Overdyke, a specialist in orthopedic surgery, that we must predicate our evaluation as to the extent and future effect of plaintiff's leg injuries upon his ability to work and his earning power. It is significant that no effort was made on the part of defendants to introduce any medical testimony which would have the effect of controverting Dr. Overdyke's findings, which, accordingly, stand undisputed and uncontradicted.
In connection with a detailed consideration of the testimony of this medical expert we think it pertinent to briefly review the testimony of plaintiff with reference to his occupation and the character of physical exertion necessitated thereby. Plaintiff testified as follows:
"Q. What is your line of work, Mr. Cush? A. I do roofing and siding.
"Q. How long have you been so engaged? A. About eight years.
"Q. At the time this accident occurred, were you in that line of work? A. Yes, sir.
"Q. And for whom were you working at that time? A. Consolidated Roofing Company.

*868 "* * * * * *
"Q. The work you're doing now, or have been doing since the accident, is that for the same people you worked for before? A. No, sir.
"Q. What concern is this? A. J. & J. Construction Company.
"Q. Who is that? A. Jim Lanfranc.
"Q. That is what type of work? A. Roofing and siding.
"Q. Which is the principal work involved there? Roofing or siding? A. Roofing.
"Q. On the top of the buildings? A. Yes, sir.
"Q. Why have you just made so little in the last two months? A. Well, I can't work but about two hours, or three hours, and then I have to stop; my legs start hurting and I have to sit down and wait for them to quit.

"* * * * * *
"Q. Now, in connection with the work that is signified by that sheet of paper, did you suffer any pain during any of the work that you were doing? A. Yes, sir.

"Q. From what source did that pain emanate? A. In my legs. My left leg and my right knee.

"Q. Did you have any other aches or pains? A. Yes, sir; I have headaches all the time.
"Q. What's that? A. I get headaches all the time.
"Q. Headaches? A. Yes, sir.
"Q. In connection with the headaches, are you required to take anything. I mean do you take anything? A. Yes, sir.
"Q. What, for instance? A. Anacin tablets, aspirin, or B.C's.
"Q. Is that almost a daily proposition, or is it once a week, or twice a week, or how often? A. It's daily. Every morning when I get up, I have to take an aspirin, or a B.C.
"Q. Now, in connection with the I believe it's your right leg in which you have the calcium deposit? A. Yes, sir.
"Q. Please tell the Court and the Jury how that leg affects you. A. Well, I can't bend it but just a little bit.

"Q. Does that have anything to do with your work? A. Yes, sir. A roofer has to more or less duck-walk all the time while he's roofing, you know; squatting down on the roof. And I can't bend this leg (indicating) but just about halfway, and I can't put no pressure on my left one on account of those muscles are not strong enough yet. I have to sit down while I work. And then when my legs and my head start hurting I have to quit.

"Q. In connection with the roofing business, is that strenuous work? Hard work? A. Yes, sir.
"Q. Can you do that sitting down? A. Well, not very good, but I do it.
"Q. Are you exposed to all of the elements in connection with that kind of work? I mean by that, rain * * A. No, sir, when it rains, we don't work.
"Q. All right. Now, do you do any siding? A. We put asbestos siding on the walls of houses, and you stand on your feet all day when you do that. Walking, you know.

"Q. Can you stand on your feet all day? A. No, sir.

"Q. Why? A. My legs just won't hold me up. They get to hurting, and I have to sit down.

"Q. You are willing to work? A. Yes, sir.

*869 "Q. You want to work? A. Yes, sir.

"Q. You got to work? A. Yes, sir." (Emphasis supplied.)
The above testimony is consistent with the findings of Dr. Overdyke upon examination of plaintiff on April 13, 1956, about four months following the accident and about one month prior to trial. Dr. Overdyke testified as follows:
"Q. And what did you find at that time, Dr. Overdyke? A. Markedly improved function in the right knee, flexion being permitted now to sixty degrees; extension, or straightening out, being complete. There is * *
"Q. Pardon me for interrupting you; will you demonstrate what you mean by `flexion being permitted to sixty degrees' in the right knee? A. Well, we showed a while ago, that the flexion was only to ninety degrees, so sixty degrees would be thirty degrees more of closing up.
"Q. And by `extension' you mean he could stretch his leg out straight? A. Straighten it out, yes, sir.
"Q. All right, sir. What did you find with reference to the function of his left knee, at this time? A. Classified as good function. No effort was made to evaluate the range of motion in this knee; it was classified as "good".
"Q. Did he make any complaints to you at that time of inability to perform any duties of his work because of his legs? A. Yes, sir. He said that two to four hours on a roof was all that he could manage.

"Q. Was this consistent with what you had found in both his legs? A. Definitely, yes, sir. And the fact that he had gone back to work a little prematurely had aided in his recovery considerably.
"Q. Now, did you find him to be sincere in his desire to get well? A. He went back a little earlier than we had planned to release him; said that his work did more for him than my exercises (laughter).
"Q. At that time, did you advise him to come back for another examination or treatment? Or did you advise him to go to work, or not go to work, or what did you advise him at that time? A. I advised him to continue to work as much as was comfortable, and to plan in approximately three weeks to return to his original occupation, full time.
"Q. Did you make an evaluation or prognosis, at that time of the future disability he would have in his legs? A. Yes, sir; we estimated it as nearly as we possibly could.
"Q. And what was your estimate, as far as the disability in his left leg was concerned? A. Approximately twenty per cent partial permanent disability of the left lower extremity, at the knee.

"Q. Now, will you explain what you mean by `permanent disability? A. One that cannot be expected to improve too dramatically, if at all, in the future.

"Q. Now, with reference to the twenty per cent estimate, is that a twenty per cent loss of use of his left leg, as a whole? A. At the knee.
"Q. At the knee? A. Yes, sir.
"Q. Would you anticipate that in a business or occupation such as a roofer, where a man is required to climb up and down ladders, stand and squat, kneel, on steep roofs, work out in the hot sun on top of a house, that he would be disabled, at least to some extent, to perform these duties efficiently? A. That's what this was based on, yes, sir.
"Q. You based your twenty per cent partial permanent disability on the *870 occupation he was following at the time he got hurt? A. That's right, sir.
"Q. Now, with reference to his left leg, what estimate of disability did you make? A. On which one, sir.
"Q. I mean his right. I believe we just had the left. A. Fifteen per cent partial permanent disability of the right lower extremity, at the knee.

"Q. And by fifteen per cent, you mean fifteen per cent of the right leg, the same way as you meant twenty per cent of the left leg? A. Yes, sir.
"Q. In your opinion, is there any expectancy that these disabilities will change materially in the future? A. It's pretty hard to sit here under oath and try to read the future, sir. To the best of my ability, as a human being, I don't think that there will be much, if any, increase or decrease in the findings in these knees, at this time, for at least a goodly number of years.

"Q. And that is twenty per cent in the left and fifteen per cent in the right? A. Yes, sir." (Emphasis supplied.)
On cross examination it is noted that counsel for defendants did not question Dr. Overdyke with reference to his estimate of disability. On re-direct examination the witness testified as follows:
"Q. Your advice to him to try to return to workto try to return to workis not your opinion that he would be able to perform his work? A. No, sir; that's why we say `try'.
"Q. `Try'? A. Yes, sir.
"Q. And you don't know whether he's been able to perform the duties of his work after that time or not, do you? A. No, sir.
"Q. And does his return to work mean that he will, or will not, have these disabilities that you have estimated, of fifteen per cent and twenty per cent? A. The disability is estimated on the basis that the man returned to full time work as a roofer; and that is what he would have, working, in my opinion, working full time as a roofer."
The testimony of the plaintiff is convincing as to his good faith in attempting to return to work at the earliest possible moment which, as the evidence shows, was even earlier than advised by his doctor. Despite this worthy desire and despite his need for money plaintiff had been able to work, up to the time of trial five months after the accident, not more than two or three hours per day at intermittent periods. There is nothing in the record which would justify the conclusion that plaintiff, after the lapse of any given period of time, would be able to return to work full time and be able to perform his work efficiently and without pain or discomfort. Dr. Overdyke did not attempt to fix any exact period of time but his conclusion, as stated in the testimony above quoted, was that there would be no change in the condition of plaintiff's legs "* * * for at least a goodly number of years."
It may be urged that Dr. Overdyke's testimony was only based upon his opinion, but this is true of all medical testimony and it must be considered that it is beyond the realm of possibility for any doctor to make a definite and certain prognosis. The passage of time is the only factor which will eventually determine the correctness, vel non, of the opinion expressed in the testimony of medical witnesses. As the record stands, the testimony of Dr. Overdyke, from a medical viewpoint, is corroborated by the testimony of plaintiff based upon his experience in connection with his efforts to work following his injury. This testimony is corroborated, at least to some extent, by the testimony of lay witnesses tendered by plaintiff. It is relevant to observe that both the medical and lay testimony on behalf of *871 plaintiff stands unchallenged. It follows that we would not be justified in concluding that the verdict of the jury, based upon such testimony, was erroneous.
Accordingly, our judgment as rendered on original hearing is set aside and it is now ordered, adjudged and decreed that the judgment appealed from be and it is hereby affirmed at appellant's cost.
GLADNEY, J., dissents, giving written reasons.
GLADNEY, Judge (dissenting).
I respectfully dissent from the majority viewpoint of this court expressed on rehearing, firmly believing that a full measure of damages was awarded in the original opinion and is more in harmony with our jurisprudence determining awards.
It is important to note that at the time of trial, which was commenced on May 10, 1956, Dr. Overdyke was testifying concerning his last examination of plaintiff on April 13, 1956, a few days more than four months from the date of the accident. At that time the plaintiff had not reached the maximum degree of expected recovery and had prematurely attempted to resume his regular occupation, the duties of which, incidentally, consisted not only in roofing but also in placing siding on houses.
It is difficult to understand why the assessment of twenty per cent partial permanent disability of the left lower extremity at the knee has any reality when read in the light of Dr. Overdyke's own testimony that upon the examination of April 13th the left knee was classified as of good functioning. He testified:
"No effort was made to evaluate the range of motion in this knee; it was classified as `good'."
Furthermore, Dr. Overdyke assigns a fifteen per cent partial permanent disability to the right knee. The evidence shows that when Dr. Overdyke examined plaintiff on April 13th, flexion in the right knee had improved as much as thirty degrees since the examination on March 13, 1956. It is difficult to understand that with such improvement an estimate of fifteen per cent partial permanent disability with a corresponding loss of earning capacity in the right knee can be accepted as reliable. Indeed, when Dr. Overdyke was pressed as to whether the percentages of partial permanent disability assigned by him to the right and left knees would materially change in the future, he answered:
"It's pretty hard to sit here under oath and try to read the future, sir. To the best of my ability, as a human being, I don't think that there will be much, if any, increase or decrease in the findings in these knees, at this time, for at least a goodly number of years."
The unfortunate position in which the medical witness found himself is apparent. He could not answer the question with reasonable certainty.
It is generally understood the medical profession has adopted no fixed or reliable rule by which can be determined with reasonable accuracy the degree of loss of future earning capacity of an individual who is partially disabled. The estimate which the medical witness in this case uses, in my opinion, is premature and speculative, if intended to signify a loss of earning capacity, but I do not think the witness meant the implications accorded by the majority herein. This case is unusual in that trial was had before the injured person had the full benefit of medical care and recuperation from his injuries. Surely, in this case prediction as to the future outcome of Cush's injuries must be accepted with some caution. The broken bones, even prior to the date of the trial had healed solidly and normally and with excellent results. Plaintiff's recovery had responded to treatment to the complete satisfaction of the doctors who attended *872 him. He had attempted to work on a roofing job prematurely and against his own doctor's instructions. Furthermore, Dr. Overdyke anticipated that when Cush had received proper recuperation he would be able to return to regular work. He thus testified as to this conclusion from the examination of April 13, 1956:
"Q. So you advised him, after three weeks from then, which would be about the first week in May, to return to full duty?
"A. If he could, that's right, sir."
I am of the opinion that permanent disability as referred to by Dr. Overdyke, is explained in his testimony that Cush would suffer from some disability and discomfort in his work for a number of years. This would seem to be natural with respect to any broken bones, but such discomfort does not necessarily interfere with substantial functioning of the body as a whole, nor need it curtail earning power.