124 So.2d 646 (1960)
Aubrey LeBlanc SIMON et al., Plaintiff-Appellees,
v.
TEXAS & NEW ORLEANS RAILROAD COMPANY, Defendant-Appellant.
No. 92.
Court of Appeal of Louisiana, Third Circuit.
November 17, 1960.
Rehearing Denied December 14, 1960.
Certiorari Denied February 3, 1961.
*648 Louie M. Cyr, New Iberia, for defendant-appellant.
H. Alva Brumfield and Robert E. Turner, Baton Rouge, for plaintiffs-appellees.
Before TATE, FRUGE and HOOD, JJ.
FRUGE, Judge.
The Texas and New Orleans Railroad Company appeals from a judgment rendered in favor of Aubrey LeBlanc Simon, individually, for the sum of $45,000 and for the use and benefit of the minors, Jerry Lawrence Simon and John Alton Simon, $16,500 and $13,000 respectively.
The facts reveal that one Alton Simon was returning home from work at the Jet Base being constructed near New Iberia, Louisiana on June 26, 1958. On his way home it was necessary that he traverse a railroad crossing in Iberia Parish, Louisiana and while crossing said railroad the "Sunset Limited" belonging to the defendant, crashed into the vehicle of Alton Simon, and, as a result thereof, he met his death. Plaintiff is the wife of Alton Simon, who brought the suit individually and on behalf of her two minor children, children of the decedent. Trial was had by Jury and after the Trial Judge's denial of defendant's motion for a new trial, defendant perfected this appeal to this Court.
The record reveals that the accident occurred at the railroad crossing on a gravel road known as the Old Segura Road Crossing. Defendant's tracks are located just South of U. S. Highway 90 and run parallel thereto. The rail-crossing on the old Segura Road, where the accident in question occurred, is located approximately thirty-eight feet South of the paved portion of U. S. Highway 90. The railroad at this crossing runs in an approximate East and West direction and plaintiff's husband was proceeding alone in his 1952 Dodge sedan automobile in a northerly direction when the accident occurred. Engineering data introduced by the defendant at the trial of the case revealed that the Old Segura Road was considerably lower than the railroad itself and at a point twenty-five feet South of the railroad crossing, the elevation of the Old Segura Road was three tenths of a foot lower than the top of the rail. At a point fifty feet South of the crossing, the elevation of the Old Segura Road was one and two tenths feet lower than the top of the rail and at a point one hundred feet South of the crossing the elevation of the Old Segura Road was two and seven tenths feet lower than the elevation of the top of the rail. At a point one hundred and fifty feet South of the crossing the elevation of the Old Segura Road was three and nine tenths feet lower than the top of the rail.
*649 While the deceased, Alton Simon, was alone in his automobile when he left his place of employment which was approximately three quarters of a mile south of the accident crossing, one George Sittig, who was also employed at the Jet Base, left in his car with two co-workers, Shirley Harmon and Lewis Bernard, simultaneously. They testified that the Simon car drove at a speed of approximately fifteen to twenty miles per hour as he proceeded north on the Old Segura Road and thereafter reduced his speed to ten to fifteen miles per hour as it approached the crossing.
It is contended by plaintiff that the defendant railroad company was negligent in keeping its right of way in an unsafe condition, in running its train at an excessive rate of speed and in failing to maintain a proper lookout and proper control over its train, and in failing to sound a warning whistle or bell. Plaintiffs further contend that the decedent was guilty of no contributory negligence and argue in the alternative that if the decedent was guilty of contributory negligence the railroad company is liable under the doctrine of last clear chance. The defendant contends that it was guilty of no negligence whatsoever and in the alternative should the Court find it guilty of any negligence, the decedent was guilty of contributory negligence which was a proximate cause of the accident. It further contends that the doctrine of last clear chance does not apply in this particular case.
Of the many acts of negligence alleged by plaintiff, we believe the two more serious acts of negligence alleged by plaintiff on the part of the defendant was that the defendant did not provide a safe crossing in that the defendant failed to maintain their right of way and allowed weeds and other growth which obstructed one's view traveling on the Old Segura Road in a northerly direction of any trains that might be approaching from his left or West, coupled with the other act of negligence that the defendant train did not sound the warning until a moment before the accident occurred or simultaneously with the accident.
Most of the witnesses testified that it was impossible to see down the tracks until the front wheels of the car were almost on the rails.
Mr. J. R. Falgout, who is a State Trooper, and who investigated the accident testified that the weeds were approximately six feet high and on cross examination testified that the weeds were six feet high from ground level elevation.
Mr. George Sittig, the driver of the automobile which was following the decedent's automobile at the time of the accident testified:
"Q. Were there any weeds or grass along this approach to the crossing? A. Yes sir, they were.
"Q. And how high would you say they were, George? A. Oh, I'd have to guess at it, sir, but they were approximately six feet in area, I mean, from the elevation of the track.
"Q. About six feet above the track? A. Well, approximately. You see, I'm looking at it from down the road. Just looking at it up because the tracks are elevated.
"Q. As you were driving along in your car, as driver could you see down to your left? A. Not very well.
"Q. Where did you have to be before you could see down to the left down that track? A. Well, sir, you would have to be practically on the railroad track itself."
Shirley Harmon, who traversed the crossing frequently, testified:
"Q. Could you see down the track to the left when you drove up? A. Not from the west; you had to be mighty close.

*650 "Q. How close did you have to be on the track? A. You had to be mighty close.
"Q. Would you say practically on the track itself? A. Pretty near. You had to be right on it."
Mr. Douglas H. Cole, who testified on behalf of plaintiff, testified that on the date in question he did not hear a whistle from the train and in his estimation the train was traveling seventy-five miles per hour. He further testified that the weeds were "awful high" and "you had to come up to the track, you had to ease up there to look both ways."
Mr. Ronald E. Owens, who testified on behalf of the plaintiff, testified that he was driving his vehicle on U. S. 90 and that he was approximately two hundred fifty feet from the intersection of the Old Segura Road with U. S. 90. He testified that the train in his judgment must have been traveling about eighty-five or ninety miles per hour and that he heard the whistle blow about a half second before the crash. He testified that the whistle blowing and the crash were almost simultaneous. He further testified that there were weeds and grass growing along the track "right up to the track" and "right up to the railroad".
Mr. Edward O. Bauer, a traffic supervisor of the City of Baton Rouge, testified on behalf of plaintiff as an expert. His testimony was to the effect that on the date of the trial one proceeding in a car from the South going North would have to be approximately twenty-five to twenty-eight feet from the crossing in order to have an unobstructed view of the railroad track to the West. It was his opinion as of the date of the trial that the crossing was a hazardous crossing. He testified, assuming that there were weeds six to eight feet in height in the area of the date of the accident, as testified by plaintiff's witnesses, a party traveling in his vehicle toward the North "would have to be mighty close" to get a view of any train proceeding East.
There were many photographs introduced in the record on the trial of the case, both by plaintiff and defendant. All of the photographs deal with the site of the accident and the weeds and grass around the site of the accident. The record also reveals that the weeds were cut five days after the accident by employees of the defendant. Mr. H. L. Chambers, Claim Agent for the defendant, on the date of the accident took several pictures, approximately one hour after the accident occurred. Mr. Chambers testified concerning the pictures primarily as follows, to-wit:
"Q. Did you observe on that day the view which could be had of an approaching train? A. I did, yes, sir.
"Q. Will you state to the Jury just what your observations were? A. I went down the road south of the track and I came back north to the point where you could get a reasonably clear view of the crossing. That point was approximately 110 feet from the tracks. That's at the intersection of that dirt road that parallels the tracks on the south side of the railroad.
"Q. Now, on that date, how near to the track would a motorist have had to be in order to get an unlimited view of trains approaching from the west? A. Well, between the point of 110 feet and the track you get several good views. From 110 feet he could see several hundred feet. In fact, I would say he could see around five hundred feet down the track. Then as he passed the road there was a clump of bushes there located around sixty feet from the tracks. After he got past this clump of bushes there he had an entirely unobstructed view, nothing in the world to cut off the view. The point was about thirty-five feet south of the track.
"Q. And from a point about thirty-five feet south of the track he would have had a clear and unobstructed view to the west? A. He could see as far as his vision could take him, yes, sir."
*651 As seen by the quoted part of his testimony, his testimony contradicts that of witnesses of plaintiff who testified in this matter. The Court has examined all of the photographs introduced in evidence and particularly the photographs introduced by the defendant and taken by the defendant's claim agent on the day of the accident. From an examination of the photographs the Court is unable to determine exactly how far a driver of a vehicle would have to be from the crossing in order to obtain an unobstructed view of a train approaching from the west on the track the day of the accident.
With reference to the warning signal given by the train as it approached the accident crossing, the engineer and fireman of the railroad company testified that they sounded the whistle of the train and the bell on the train for a considerable distance, approximately a quarter of a mile before reaching the crossing and continuously sounded the whistle and bell until the train came to a rest after the accident.
On the other hand, George Sittig, Shirley Harmon and Lewis Bernard, the three people who occupied the car immediately behind the Alton Simon car, each testified in substance that they did not hear the whistle blow or bell ring until just before the collision.
Ronald Owens, who was approximately 250 feet from the accident testified that the whistle blew approximately one-half second before he heard the crash.
The Jury in arriving at its conclusion obviously determined that Simon, traveling the Old Segura Road in a northerly direction, had an obstructed view to his left which prevented him from seeing any train traveling in an easterly direction until he was very close to the railroad crossing. It must have also determined that the railroad company's train did not give a warning until it was very close to the crossing in order to find for plaintiffs after having been given the law by the Trial Judge. In arriving at the facts governing the case, the evaluation of the witnesses' testimony is of paramount importance. The Jury, in determining the facts of a case have the opportunity to see and hear the witnesses. The jurors also have the important task of evaluating the testimony as given by the witnesses. The Jury obviously believed the plaintiff's witnesses and the Trial Judge in his statement in his reasons overruling a motion for a new trial stated that he did not believe that the Jury had made any manifest error and that they were unanimous in their decision and conclusion. It has been repeatedly held that the Court will not set aside a verdict of the Jury in a case where the testimony is conflicting and where the testimony of the witnesses is sufficient to sustain such a verdict if accepted as credible. See Roux v. Attardo, La.App.1957, 93 So.2d 332; Cush v. Griffin, La.App.1957, 95 So.2d 860; Mire v. St. Paul Mercury Indemnity Company, La. App.1958, 103 So.2d 553; Hardie v. Allen, La.App.1951, 50 So.2d 74.
The Jury's function is to find facts relating to negligence, contributory negligence, last clear chance and damages. In the case of Ross v. Sibley, 116 La. 789, 41 So. 93, 95, the Supreme Court stated:
"The question of negligence was one of fact, and we are not prepared to say that a verdict of the jury was erroneous."
See also Henwood v. Wallace, 5 Cir., 159 F.2d 263, Foreman v. Texas & N. O. R. Company, D.C.La.1951, 97 F.Supp. 378; Missouri-Pacific Railroad Company v. Soileau, 5 Cir., 1959, 265 F.2d 90.
That the Jury's findings on contributory negligence should be undisturbed unless they have no basis in evidence has been recognized in Aaron v. Martin, La.App. 1936, 167 So. 106; Illinois Central Railway Company v. Aucoin, 5 Cir., 1952, 195 F.2d 983.
Defendant contends that if in fact the view of Simon was obstructed then the *652 greater caution the law enforces upon Simon and in support thereof cites Hutchinson v. Texas & N. O. R. Company, La.App. 1947, 33 So.2d 139; Calvert Fire Insurance Company v. Texas & Pacific Railway Company, La.App.1951, 55 So.2d 693; Brinson v. Illinois Central Railroad Company, 5 Cir., 241 F.2d 494. While it is true that if the right of way is obstructed the driver of the vehicle must exercise a higher degree of caution, the Courts have pointed out that the railroads are held to a degree of caution commensurate with the added hazard or danger which results from the existence of these obstructions. 44 American Jurisprudence, verbo, "Railroads", Section 507; Wyatt v. Yazoo & M. V. R. Co., 13 La.App. 632, 127 So. 479; Rachal v. Texas & P. Ry. Co., 61 So.2d 525. Also see McFarland v. Illinois Central Railroad Company, La.App. 1960, 122 So.2d 845. Assuming that the Jury found that the view was obstructed and considering the charges given by the Trial Judge to the Jury, then the Jury must have ascertained that the whistle blowing and bell ringing as testified by the engineer and fireman did not occur as they testified but that in fact they actually blew the whistle just a moment prior to the collision which occurred and, accordingly, did not exercise that duty commensurate with the situation at hand. While there is evidence that the train was traveling in excess of 70 miles an hour this testimony was obtained from witnesses who saw the train going by and which speed is very difficult to estimate. We believe that there is a preponderance of evidence that the train did not in any way slow down for the crossing and only applied its brakes a moment before the impact. Inasmuch as the facts reveal that the fireman and engineer saw the Simon automobile approaching the crossing and knowing or charged with the duty of knowing that the view of the driver of said vehicle was obstructed and from their own testimony that they did not slow down the train, coupled with the testimony of the other witnesses that the train did not sound its whistle or if it did sound its whistle it was sounded only a moment before the impact, we must concur with the findings of the Jury that the engineer and fireman of the approaching train did not exercise that caution and duty commensurate with the situation to avoid the collision.
In the case of Pokora v. Wabash Ry. Co., 292 U.S. 98, 100-101, 54 S.Ct. 580, 581, 78 L.Ed. 1149, 1151, Justice Cardozo expressed the finding of negligence in this manner:
"The record does not show in any conclusive way that the train was visible to Pokora while there was still time to stop. * * * Nice calculations are submitted in an effort to make out that there was a glimpse of the main track before the switch was fully cleared. Two feet farther back the track was visible, it is said, for about 130 or 140 feet * * *. Pokora was not protected by his glimpse of 130 feet if the train at the same moment was 150 feet away or farther. For all that appears, he had no view of the main track northward, or none for a substantial distance, till the train was so near that escape had been cut off."
We believe that the Jury, having had the opportunity to see and listen to the witnesses could reasonably find that the plaintiffs furnished ample proof that the defendant was derelict in its duty. Having found so, the defendant has the burden of proving contributory negligence by a preponderance of the evidence showing that the decedent failed to act as a reasonable and prudent man and that his negligent conduct was a contributing cause of the accident. The presumption of law is that the decedent acted in response to the natural instincts of self-preservation and did not seek to commit suicide by exposing himself to unnecessary risks of death. Boykin v. Plauche, La.App.1936, 168 So. 741; Kern v. Knight, 1930, 13 La.App. 194, 127 So. 133; Aymond v. Western Union Telegraph Co., 151 La. 184, 91 So. 671, 672. The evidence *653 reveals that the decedent, Simon, did not come to a complete stop before crossing the railroad. However, from the evidence adduced at the trial, all witnesses are in accord that he slowed down to approximately 10 to 15 miles per hour as he approached the railroad track. Whether or not he actually looked for approaching trains, there is a conflict of evidence. However, assuming that the Jury found that the obstructions were present and said obstructions denied visibility to the driver of the vehicle of the approaching train even had he in fact stopped nothing would have been accomplished unless he would have descended from his vehicle. While it is the duty of every person operating a vehicle when approaching a grade crossing of a public highway with a railroad to bring his vehicle to a complete stop as provided for by LSA-R.S. 32:243, LSA-R.S. 45:563 provides that where while a person has a duty to stop and look for approaching trains the proximate cause of the accident and injury is for the Jury to determine regardless of the penalizing feature of LSA-R.S. 45:564. A motorist need not come to a complete stop before crossing a railroad provided the motorist has his automobile under such control as to be able to stop immediately and has exercised due care in looking and listening for an approaching train. See Robertson v. Missouri Pacific Railroad Co., La.App.1936, 165 So. 527. Furthermore, contributory negligence cannot be automatically assigned and it is necessary that the person alleging contributory negligence prove same by a preponderance of the evidence. Bergeron v. Greyhound Corporation, La.App.1958, 100 So.2d 923.
In the case of Dobrowolski v. Holloway Gravel Company, La.App., 173 So. 474, 476, the Court stated:
"This court has committed itself to the rule that the failure of a motorist to come to a complete stop before crossing a railroad track does not necessarily and at all event preclude a recovery unless it appears that the failure to stop was the proximate cause of the accident. Robertson v. Missouri Pacific R. R. Co., La.App., 165 So. 527; Aaron v. Martin, La.App., 167 So. 106. This rule means that the motorist will not be held guilty of such contributory negligence as to bar recovery if he keeps a proper lookout on approaching the crossing and has his car under such control as to be able to come to an immediate stop if necessary, and provided further, that it reasonably appears from the circumstances of the particular case that the accident would have been avoided had the motorist come to a complete stop."
The Jury concluded that the decedent, Simon, was not guilty of contributory negligence which was a proximate cause of the accident and we can find no manifest error in said conclusion.
Having concluded that the Jury had ample evidence upon which to find the defendant guilty of negligence which was the proximate cause of the accident and sufficient evidence to find that the plaintiff's deceased husband was guilty of no contributory negligence which was a proximate cause of the accident, there is no need for this Court to consider the other allegations of negligence as alleged by plaintiff.
The Jury awarded Mrs. Simon individually the sum of $45,000; and as natural tutrix of her minor children, Jerry Lawrence and John Alton Simon, for their use and benefit, $16,500 and $13,000, respectively. The copies of income tax returns of the decedent, Mr. Simon, were filed in evidence and revealed that he made approximately $4,700 per year, which fact was also testified to by Mrs. Simon. The evidence reveals that Mr. and Mrs. Simon were married in 1941 and had two sons, one born in 1942 and the other in 1944. There is no evidence to the contrary that Mr. and Mrs. Simon experienced almost 20 happy years together and were a most congenial couple. Considering the special damages of funeral expenses and property *654 damage, we do not believe that the award of $45,000 is excessive in the instant case. In Day v. National-U. S. Radiator Corporation, La.App.1960, 117 So.2d 104 which involved a 30 year old husband who had an annual wage of approximately $4,000, the widow was awarded $42,983.28. In Marler v. State, La.App.1955, 78 So.2d 26 the decedent was 60 years of age at the time of his death and earned approximately $5,000 the year before his death. In that case, his life expectancy was 13.47 years and the widow was awarded $30,000 for loss of support, and $10,000 for loss of love, affection and companionship. In McFarland v. Illinois Central Railroad Company, 122 So. 2d 845, where deceased's life expectancy was 36 years, the widow was awarded $35,000 for loss of support and $7,500 for loss of love, affection and companionship besides awards for pain and suffering of deceased, medical and funeral expenses.
In the case at bar, since deceased was 38 years old, then according to the American Experience Mortality Table, LSA-R.S. 47:2405, deceased had a life expectancy of approximately 29.62 years. Based on his approximate annual income of $4,700 multiplied by his life expectancy of 29 years decedent would have earned $136,300 during his lifetime. Mrs. Simon would be entitled to one-half or $68,150. Employing the annual figure of $2,350 (one-half decedent's annual wage of $4,700) and using 15.14107357 as the present value of one, taken at 5% discount for 29 years the loss of earnings and support to Mrs. Simon is determined to be $34,800.18 or approximately $35,000 for loss of support. Using the above figures she received less than $10,000 ($45,000 total award less $35,000 loss of support less medical and funeral expenses) for loss of love, affection and companionship.
In arriving at the value of the loss of support award to be made to the minors under the facts shown by this record we are inclined to employ, for purposes of comparison and analysis, the formula of the Day case, cited supra, as modified by the McFarland case, supra, wherein such loss was predicated upon the Federal Income Tax deduction of $600 per child per year discounted at 5%.
Thus Jerry Lawrence Simon, 16 years of age, was entitled to five years support at $600 per year or $3,000. Using the annual figure of $600 and 4.32947667 as the present value of one to be taken at a discount of 5% for five years the value of his claim for loss of support would be $2,597.89 or roughly $2,600. John Alton, 14 years of age, would be entitled to seven years of support at $600 per year or $4,200. Using the annual figure of $600 and 5.78637339 as the present value of one to be taken at a discount of 5% for seven years the value of his claim for loss of support would be $3,471.82 or roughly $3,500.
In view of the fact that Jerry Lawrence was 16 and that John Alton was 14 at the time, it is obvious that the jury apparently confused the two when it awarded Jerry $16,500 and John $13,000. Therefore, we will change the amounts for their use and benefit to read $13,000 for Jerry and $16,500 for John.
In view of the above change it is evident that Jerry was awarded $10,400 ($13,000 gross less $2,600 loss of support) for loss of love, affection and companionship and that John was awarded $13,000 ($16,500 gross less $3,500 loss of support) for loss of love, affection and companionship.
Although the jury awards did not give a break-down of each award we feel that the application of the Day-McFarland method approximates that rule which in all likelihood is the least arbitrary of any yet devised. However, as was stated in the Day case * * * "while we do not necessarily accept this method as being applicable to or controlling in all instances, we believe the amounts thus determined are reasonable in the light of the circumstances of this particular case * * *" [117 So.2d 127] (Emphasis added).
In the matter of awards for loss of love, affection and companionship we are faced *655 with the imponderable of imponderables. The loss of companionship, especially to two teenage boys, as is the case at bar, is immeasurable. We can find no compelling reasons in the record that warrant a substitution by the court of a lesser or greater amount.
The question of whether or not remarriage would affect the award is not before us and we are not concerned therewith.
In the case of Brown v. S. A. Bourg & Sons, Inc., 239 La. 473, 118 So.2d 891, 895 Justice Viosca discussed certain considerations that must be taken into account in determining damages such as: determining loss of support by multiplying the annual contribution by life expectancy with an allowance for discount on advanced payments; life expectancy of the survivor; divorce rate; percentage of re-marriage of widows and earning capacity of second husbands; condition and health of decedent and his possible retirement; wage fluctuations; and devaluation of the dollar. He went on to say that: "The monetary damages resulting from loss of support Cannot Be Calculated with Mathematical Exactitude. They are Speculative in Nature and as in the case of damages for loss of love and companionship, mental anguish and other damages of that character, much discretion must be left to the judge or jury." (Emphasis ours.) In the case of Duree v. State, La.App., 96 So.2d 854, 863, in discussing damages the following language was employed: "The award of damages for personal injury or death is of necessity somewhat arbitrary; loss of love, companionship, support (both spiritual and financial), understanding, and guidance of a good father and husband has no monetary equivalent. While the damages should be compensatory of the loss sustained, Article 2315, LSA-C.C., in cases such as the present, where the damage is certain but of uncertain pecuniary value, much discretion must be left to the trier of fact, Article 1934, subd. 3, LSA-Civil Code, * * *. Although awards so made may vary greatly with the facts of each case, likewise they should be made with some degree of uniformity with those made for similar losses * * *."
Under the circumstances of this case we find that the awards made by the jury (as corrected herein) are neither excessive nor inadequate, but rather are commensurate with the loss sustained.
From the foregoing it follows that the judgment of the lower court should be and is hereby amended by changing the award for the use and benefit of Jerry Lawrence Simon from $16,500 to $13,000 and that for the use and benefit of John Alton Simon from $13,000 to $16,500.
Accordingly and for the foregoing reasons the judgment as amended is affirmed. Costs of this appeal to be paid by appellant.
Affirmed.